[Crim. No. 3383.  In Bank.—March 31, 1931.]

THE PEOPLE, Respondent, v. GEORGE E. DARROW, Appellant.

C. V. Caldwell, James E. Fenton and John S. Cooper for Appellant.

U. S. Webb, Attorney-General, Alberta Belford, Deputy Attorney-General, Buron Fitts, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

SEAWELL, J.—Appellant was accused by an indictment returned against him by the grand jury of the county of Los Angeles of the crime of murder, alleged to have been committed on July 23, 1929. The person alleged to have been murdered was Jenny Rose Peterson, a married woman living separate from her husband, and of the age of twenty-three years, and the mother of two children, aged three and five, respectively. Death ensued as the result of an unlawful attempt to commit an abortion. The jury returned a verdict of murder of the second degree. The appeal was taken upon several grounds, to wit, errors in the rulings of the court on objections to the admission of evidence; errors in giving and refusing instructions to the jury; insufficiency of the evidence as to the cause of death; insufficient corroboration of the testimony of the alleged accomplice; error in refusing to consider on its merits appellant's application for probation.

The appeal was originally taken to the District Court of Appeal, Second Appellate District, Division One, and an order of transfer of said case to this court was made upon the application of the attorney-general, after decision by said Court of Appeal, reversing the judgment of conviction. Said District Court of Appeal, in its review of the case, quite properly held that the testimony of the alleged accomplice, Henry Smith, aged twenty years, who assumed responsibility for the pregnancy of said Jenny Rose Peterson, was not only corroborated by other evidence and circumstances showing the commission of said offense, but, separate and apart from the testimony of said alleged accomplice, the evidence in its legal effect was sufficient to connect the defendant with the commission of the offense. We are also in accord with that portion of the decision of the District Court of Appeal which holds that the trial court properly refused to instruct the jury that Smith was an accomplice as a matter of law, but, instead, left the jury free to determine that question "as the evidence did not conclusively establish the relation of Smith to the defendant as that of an accomplice".

The grounds upon which the reversal of the judgment were placed by the District Court of Appeal and which are defended by the appellant upon resisting the application for a transfer of the cause are, first, that prejudicial error as to the intoxicated condition of appellant was committed by the trial court in admitting the testimony of several witnesses who saw and conversed with the defendant at fixed periods, beginning with the time the deceased was found to be in a dying condition upon the operating chair and continuing several hours thereafter; second, by admitting testimony showing the amount of money appellant had upon his person after he had denied to the officers that he had any other than some pocket change, and his subsequent attempt to account for the possession of $55 in currency, found upon his person, from sources other than moneys paid to him by Smith as a part of his fee for the services which he was to render; third, improper and prejudicial cross-examination of a practical nurse who at times was about the premises, but who seemed to take a small part in ministering to the deceased during the several days she was at appellant's quarters and under his care. The specific questions asked and answered, among others on the same subject which appear to render the question and answer specially singled out as important, by reason of the uncertainty and ambiguity as to what thought the witness intended to impart. by her answers—if it may be correctly held to constitute error to test the credulity or good faith of a witness in the circumstances shown to exist, by the method here adopted— is best illustrated by reproducing (omitting the objections) the situation, as presented by the record:

"Q. During the time the defendant Darrow had this girl on the stand, as a nurse, did you form any conclusion as to what he was doing? A. Yes, sir. Q. Did you at that time, form the opinion that he was about to commit an abortion upon that girl? A. No, sir; I knew he was making a thorough examination of her. Q. You did not suspect the case was an abortion case? A. I might have suspected it, yes, sir. Q. As a matter of fact, you did suspect it, did you, not? A. Yes, sir. Q. You knew it was an abortion case? A. No, I did not know it to be positive, no. Q. But you suspected so? A. Yes. Q. You thought at that time that Dr. Darrow was about to perform an abortion upon that.

girl, did you not? A. No, I did not know that he was at all. He was making an examination. I might have suspected it in my own mind. Q. You did suspect it, did you not? A. Yes, I suspected that he was examining her for pregnancy. Q. I am asking you if you did not suspect at that time that Dr. Darrow was about to commit an abortion? A. No, I didn't suspect that he was about to commit an abortion. I suspected she was pregnant. That is what I expected.''

The witness' attention was called to her testimony, given at the coroner's inquest, in which she again stated that she did not know that Smith and the deceased had come for the purpose of having an abortion performed, but that she may have suspicioned it.

With the foregoing statement of the main grounds of the reversal, we will briefly state the facts of the case and the result of the autopsy as related by the sole physician called in the case (except the defendant) and whose testimony stands absolutely unimpeached. In fact, the testimony of Smith is corroborated in many important particulars by the defendant and much incriminating testimony against the defendant was received in the case. As to statements made by him to persons who early arrived at his office at Azusa, after the death of Jenny Rose Peterson, they were neither admitted nor denied by him, upon being called to his attention.

The deceased, whom all the evidence, including the autopsy examination, showed to be in good health, had been an employee, as a packer of soap, of the Los Angeles Soap Company, for a period of eight years. There she met Henry Smith, also an employee. Both were residents of the city of Los Angeles. Their association resulted in a visit to Dr. Darrow's office at Azusa, on Thursday evening, July 18, 1929. Smith's testimony is to the effect that their visit was made upon the insistence of the deceased, who was much disturbed as to her prospective motherhood. It would seem that the defendant, according to his testimony, had some time prior theretofore met deceased and treated her for what he claimed to be an incipient lung trouble. It was his claim that he was specializing in pulmonary tuberculosis. There is no dispute as to the number of times or the duration of the deceased's visits to Dr. Darrow's offices, which

were located in his residence at Azusa, in company with Smith. The first visit was made Thursday evening at about 8 o'clock, July 18, 1929. Smith testified that the deceased had previously told him she was pregnant and said she was going to Azusa to have an operation performed. He said he tried to dissuade her from her purpose and made a proposition to take her to another state and eventually marry her, but she had decided to have the operation performed. It seems that in the latter part of June or the forepart of July, 1929, Smith, on one or two occasions, paid for drugs such as ergot and cottonwood bark, and for articles which were taken and used by the deceased without effect. At the first visit, Dr. Darrow was told by Smith that the young lady would like to speak with him privately, whereupon he took her into his office, where they remained for five or ten minutes. Later, he called Smith into the office and asked him if he would be able to take care of the financial end of the matter, the operation. Smith asked Dr. Darrow what the charge would be and the latter answered that it would be $150. Smith said he would not be able to pay that much and Dr. Darrow asked him how much he would be able to pay. Smith stated that he had $100 and appellant suggested that he pay down that sum and pay the balance in installments. Smith replied that he supposed there was no other way out of it and Dr. Darrow requested the payment of $100 then and there. Smith did not have all the money with him, but was supposed to bring it to appellant on the following day and the decedent was to return on Saturday afternoon for treatment. Smith and the deceased returned at 4 or 4:30 o'clock Saturday afternoon and Smith paid him $90, consisting of one $50 bill, one $20 bill, one $10 and two $5 bills. Appellant took deceased into the operating room, where she remained for some five minutes, and, upon returning her to the hall where Smith was awaiting, said that he could not see on account of darkness and directed both to return Sunday afternoon during the daylight period and he would "do it" in the daylight. Both arrived at 3 or 4 o'clock Sunday afternoon and waited until 6 o'clock and, upon the arrival of appellant, he took both into the operating room and placed the deceased upon the operating table and threw a sheet over her lower extremities and Smith stood at her head, holding her hands. Appellant stated that he had

inserted a catheter. This operation only required a few minutes and the appellant said the deceased had better remain all night, as she might become sick and require attention during the night. That night she went to a show, but came back and remained all night. On the following morning, appellant went to the bedroom of deceased and told her to come into the operating room. Dressed in her nightclothes, she got upon the operating table and placed her feet into the braces of the table and appellant again threw a sheet over her lower extremities and Smith was given a "handle with cotton" on it. The cotton contained ether or chloroform and the deceased was told to smell it, as Smith held it near her nose. While he was thus engaged, the appellant was veiled from Smith's view by the sheet which covered him and Smith could hear "tools and things clicking". After the passing of ten or fifteen minutes, the appellant came from his position and said that would be all for the present and that the deceased would have to remain for another night; that he would finish on the following morning, Tuesday; that he could only finish one section that night. At about the same hour on the following morning, he repeated the performance, Smith holding a piece of cotton, saturated with what he believed to be ether or chloroform, to her nose. A sheet screened appellant from Smith's view, but he heard what he describes as the "clicking of tools", at the foot of the operating table. After about five minutes the deceased complained of feeling sick, began coughing, bit her lips, clenched her teeth together and, to repeat the language of Smith, "she had passed out'. He called the appellant's attention to her condition and he came from his position and said she had "just fainted".. Smith carried her on to the bed and appellant told him to work her arms up and down to stimulate artificial respiration. At this juncture the nurse came running in and Smith asked her to do something, as the doctor did not seem to be doing anything. Both labored to restore respiration and presently the appellant returned and injected something into her arm. Smith suggested that appellant call the fire department and have them bring their pulmotor, but appellant told him to keep up the respiratory motion, as that was just as good as a pulmotor, and she would be all right in a few minutes. Appellant returned

to the room again and gave her another hypodermic injection. The firemen arrived at about this juncture with a pulmotor or inhalator and, after removing her to the open air, made a vain attempt to revive the deceased. A physician called from across the street pronounced her dead. Smith smelled alcoholic liquor upon the breath of appellant immediately after he carried the body of the deceased from the operating room. Death ensued at about 10 or 10:30 o'clock. The effort at restoration continued for some time. C. E. Midkiff, the driver of the city fire-truck, arrived at the scene at 11:30 A. M., bringing the city's inhalator for emergency use. He smelled intoxicating liquor upon appellant's breath and described his gait as very unsteady, as he held to the door-sills and chairs as he passed from room to room. He took no part in the effort to revive her. He asked appellant who the young lady was and he replied that "she just came in here this morning for examination". He then asked him if anyone was with her and appellant said, "Yes, her husband there [referring to Smith] at her feet." He further stated that she died from heart trouble and added that "she is one of those kind, you stick her with a pin and she goes out". The witness described an attempt on the part of appellant to administer a hypodermic injection in these words: "I saw him inject a needle into her right arm; before he injected the needle he rubbed a rag over the arm. I don't know if it was a handkerchief or what it was. I saw him jab the needle in and when he squeezed on it all the adrenaline which he gave her came out upon her around the plunger of the hypodermic needle and spilled on her arm, and he wiped it off and left the room." At one time during the attempt at resuscitation appellant asked the witness if he thought a second injection of adrenaline would do any harm. When the witness asked appellant for some clean towels he pulled out of the wastebasket three or four bloody towels. While using the inhalator, the mask several times became clogged with blood evidently from the mouth. C. E. Gauldin, chief of police of Azusa, arrived upon the scene at 12:15 P. M., approximately two hours after death. He observed a strong odor of alcoholic liquor upon appellant's breath and also that his gait was unsteady. Appellant said the girl had come for a general examination and that while he was examining her he

observed that her uterus was very blue and that was the first time he realized what the matter was. He looked up and saw blood coming from her ears, nose and mouth. She was of the type known as a bleeder. Frank B. Gumpert, deputy sheriff and criminology expert of the sheriff's office, arrived at appellant's office at 1:30 P. M. He found in the operating room an open bottle containing fluid which bore the odor of chloroform and was labeled "Chloroform—Squibb". Upon the stove in the kitchen he observed a sterilizing vessel, the water being still hot, containing three curets, three speculums, three sounds, two pair of curved forceps, one straight forcep, one cervical dilator, one pair of ovium forceps, a pair of tentaculum forceps and an instrument with a very large handle attached to a flat curved needle, with an eye near the point. A bottle of pentabromides was also found upon the dining-room table, which appellant accounted for on the basis that he occasionally used bromides as a sedative for headaches and an impaired condition of his nerves produced by shock suffered by an automobile accident, which occurred some eight months prior thereto, in which the base of his skull, spine and both knees were injured. Gumpert noticed a blood spot at the corner of deceased's mouth and an abrasion on the inner side of her lip. He identified several blood-stained sheets and observed large blood stains, as did others, immediately beneath the trunk of the body, where it rested on the bed mattress. That that blood came from deceased's vaginal organ there can be no doubt; no attempt was made to refute the evident fact, established by several witnesses. Appellant, in an attempt to account for the dead body at his office and to explain the cause of decedent's death, said that she came to his office that morning (July 23d) and that while he was using a speculum and swabbing out the mouth of the vagina, deceased passed out. Appellant's gait was unsteady and his breath was laden with the odor of alcoholic liquor.

We have reproduced to some extent the gruesome word picture as told by the several witnesses, and which is not contradicted in any respect, for the reason that it is contended that the evidence is insufficient to sustain the judgment of conviction. The physical features being established, we now come to a consideration of the testimony of the autopsy physician, Dr. Lawrence Parsons, and its impelling

effect. His testimony stands without contradiction in any respect. The autopsy was performed some six or seven hours after death. The deceased, in his opinion, was about twenty-four years of age and had been pregnant about three months. The fetus was decapitated and was lying free in the uterine cavity, and the fetal membranes had been ruptured. The skin on the back of the fetus was somewhat torn. In his opinion, the fetus had been dead eight or ten hours. He was also of the opinion that the cause of the death of Jenny Rose Peterson was pulmonary embolism following an abortion. The physician described pulmonary embolism as a blood clot or other foreign body which is propelled by the heart action into the blood circulation and which, upon entering the lungs, produces a condition of occlusion, or a plugging of the arteries of the lungs. The autopsy physician's description as to the condition in which he found the lungs, but a few hours after death, leaves no reasonable doubt but that the effort to remove the fetus was the direct cause of the minute hemorrhagic condition, which accounted for the bleeding at the nose, mouth and ears immediately before death, all of which was brought about by the use of instruments in an attempt to remove the fetus. The mutilated condition of the fetus and other physical injuries, as described by the physician, could not, in the opinion of the autopsy physician, nor in the opinion of a layman, have been caused by drugs or by physical manipulation. The deceased was a young woman in good health, none of her major organs showing any evidence of disease. There was no evidence that the deceased had a predisposition to thrombosis, that is, the plugging of a blood vessel, through the formation of a clot within its walls. It would have taken the embolus but a few seconds to be transmitted from the uterus through the pelvic organs to the heart and thence to the pulmonary organs, where it was lodged. The autopsy physician testified to a fresh puncture wound upon the lips of the cervix—the mouth of the womb—which, in his opinion, was probably made by an ordinary tentaculum forcep, such as is commonly used to examine the uterus. This instrument has two sharp prongs, one of which is hook-shaped, and, by its use, the surface of the uterus can be brought down to close view of the operator. Such an instrument, together with other instruments, some of which are exclu-

sively adapted to the removal of foeti, and others to the general practice of obstetrics, were found in a condition of sterilization in a vessel containing hot or warm fluid. Such instruments would, in the opinion of the surgeon, have produced the internal injuries which were disclosed by the autopsy.

██ Smith was asked in the presence of the appellant if he had paid him any money and he replied that he had made a partial payment of $90 on account of services, describing the denomination of the currency as heretofore stated. The appellant had denied that Smith had paid him any sum. The defendant was then placed under arrest and was told to take everything out of his pockets and place them upon the table. He drew out a number of articles, including a billfold and sixty or seventy cents in change and, upon being asked if that was all the money he had, he replied that it was. In the search of his person, a fob pocket on the left side of his trousers was found to contain $55 in currency, consisting of two $20 bills and three $5 bills. He had previously heard Smith decribe the currency he had paid him as containing a $50 bill and he suggested that Smith describe the currency which he paid him. When confronted with the currency taken from his person, he said that he had forgotten he had it. In explaining how he came by it, he gave the names of several persons whom he claimed had recently paid him stated sums, but when said persons appeared as witnesses, they impeached his statements. It is true that the denominations, number of bills and sum total thereof which Smith testified he paid appellant on the preceding Saturday did not agree with the bills found upon him three days thereafter, but in the light of the fact that appellant denied that any financial arrangement whatever existed between them with respect to the medical attention that deceased was to receive from appellant and such question going to a material issue in the case, to wit, whether a consideration was to be paid for the commission of an unlawful act, said evidence, irrespective of its evidentiary strength, was admissible as throwing some light on said issue. It was also properly received as tending to show a consciousness of guilt. At no time during appellant's somewhat extended examination as a witness did he suggest that anyone had agreed to pay any sum for medical services

rendered or to be rendered by him, nor did he pretend, during the two or three days that the deceased was at his place, that anything was said by anyone as to who was to pay the bill for her care, keep and the medical services rendered by him while she was thus in his care. The testimony of Smith as to having borrowered $100 from Alfred Olson, whom he had known five or six years, in the denominations described and at the time stated by Smith, was corroborated by Olson.

We now revert to the testimony of Mrs. Marie Gray, whose examination *in haec verba* is quite fully heretofore set out, in order to illustrate the grounds upon which appellant predicates prejudicial error. The witness testified that she was not a trained nurse, but was a practical nurse. She had known the appellant for about two years, meeting him first at Hollywood. She was not in his continuous employ, but was a nurse "on call". The witness, it would seem, was not in the employ of appellant as to decedent's case until Monday morning, when she rendered some slight service. She seemed to have been about the premises on Thursday, as she saw Smith and the deceased when they arrived for the first time on Thursday, July 18th, but she had no contact with either. The witness next saw said parties leaving appellant's office on Saturday night. She was then in the living quarters and did not speak with either. On Sunday she met them at the door and had quite an extensive conversation with Jenny Rose Peterson. The latter seemed very nervous and worried about her condition and was anxious to see the doctor, who was not in. She said she did not know what was to become of her and that she was in poor physical condition; she also said, so the nurse testified, that she had done everything she knew to do and had been treated in Los Angeles, but got no results. The nurse told her not to worry, that the doctor would be in early. The witness left and did not see the deceased again until the next morning at 10:30 and the doctor asked her to assist decedent upon the examining table, and to cover her with a sheet, and decedent asked for something to relieve her, as she complained of being very sore. She was given something. Smith and the nurse were attending her. The doctor asked for a speculum and she handed him one from a sterilizing tank, which contained two other instru-

ments which she called speculums and forceps. She did not see the doctor with any other instruments. As the doctor started to insert the speculum, the decedent said she was very sore and nervous and, at this juncture, the nurse stepped out of the room and, as she returned, the doctor said, "Well, we are going to put this girl in bed. She is too highly nervous and in no condition for an examination at this time." The nurse absented herself at least twice from the room during what she stated to be a five-minute examination. The witness next saw the decedent the following morning at about 10:30 and she was then in an unconscious condition, from which she never regained consciousness. The witness, who claimed to be a practical nurse, connected with appellant in his practice, certainly placed herself in a position not easily understood in a case in which duty would seem to have called her to the aid of a woman whose condition, as described by the nurse, required the services of a woman nurse. The impression which she attempted to make upon the mind of the jury was that appellant did nothing more than to make an examination of the body of the deceased. She said that she knew that he was doing nothing more harmful or dangerous to life than the making of a thorough examination and, notwithstanding the soreness and the painful condition of the private parts of the deceased, she left the room and was outside of the operating room more than one-half of the time the *examination* was in progress on Monday and did not enter at all on Tuesday morning until the tragic moment struck and she was summoned by the alarm given by Smith and the confusion which followed. It was admitted by appellant that both Smith and the deceased had upon the first examination requested the services of a nurse. It is singular indeed that the nurse, who observed at a distance said parties upon their first and second visits to the doctor's office, was present only once, and then for a brief period, during the three or four times that the deceased was upon the operating table, although she seems to have been within easy call. In view of the anomalous situation in which the witness nurse placed herself by attempting to eliminate the use of all instruments found in the sterilizing tank, save possibly the two or three she named, it was not prejudicial error, in the further view of the apparent pregnancy of the deceased and the troubled

mental state of the decedent concerning her condition, and as a test of her good faith, to ask her in the light of all she knew and saw if she, as a nurse, did not suspect or suspicion the case was an abortion case. That question would not, in the first instance, necessarily incriminate the appellant if, as a matter of fact, acting in good faith, appellant attempted to empty the uterus in the interest of the health or for the preservation of the life of the patient. Notwithstanding the question asked, the witness adhered to the answer that the appellant merely made a thorough examination and used no instrument that she observed other than those heretofore named. That one or both of the visiting parties desired the commission of an abortion may have been strongly suspected by a person who had observed the demeanor and heard the story as told by decedent to the nurse, which testimony was brought out by the appellant, but from this it would not follow that the appellant committed an abortion. Opportunity to commit a crime is an essential element in every crime. The questions complained of were aimed at the unusual conduct of the witness in the circumstances of the situation. The witness' adherence to her story, and this alone, would seem to be a sufficient answer to the claim of prejudicial error. Besides, the jury was especially instructed that it could not convict upon suspicion, however strong such suspicion might be. The admissibility of this class of impeachment testimony is thoroughly settled. See discussions: 2 Wigmore on Evidence, 2d ed., sec. 1041; Greenleaf on Evidence, 16th ed., p. 462; *Denver City Tramway Co.* v. *Lomovt,* 53 Colo. 292 [Ann. Cas. 1914B, 106, 26 Pac. 276]; 30 Am. & Eng. Ency. of Law, 2d ed., p. 1112; *People* v. *Donovan,* 43 Cal. 162.

█ It is elemental that no error was committed in admitting the testimony of Henry Smith as to detecting liquor upon the breath of appellant, as he was carrying the body of the deceased from the operating chair to a bed, immediately upon her having collapsed, nor in admitting the testimony of other witnesses who saw and conversed with him at periods of from one to two hours after the death of said Jenny Rose Peterson as to facts tending to show inebriety. The weight of this testimony was a proper matter for the jury's consideration, in the light of all the other facts and circumstances of the case. The mental condition of a

person at the time a crime is committed is a part of the *res gestae*.	██	The testimony as to a bottle of pentabromide being on the dining-room table, and appellant's occasional use thereof as a nerve sedative, could not have unduly or at all prejudiced appellant's case. Naturally drugs of this character are to be found in physicians' offices, as well as various kinds of surgical instruments. It is not the presence of medicines and surgical instruments in a physician's office—which is not only lawful but necessary—but the use of the same in the commission of an unlawful act that becomes important. If such are not put to an unlawful purpose, their presence is harmless. Pentabromides were certainly not used as an anaesthesia administered to the deceased, and, even if they were, or even if the doctor did sometimes take this mild sedative for any purpose, the question could have no possible prejudicial effect in the case. The subject is of little or no importance.

The appellant became a witness in his own behalf. We have read and re-read his testimony and, even in a serious matter, we are forced to say that his testimony is vague, uncertain, inconsistent, and abounds in instances in which he declined to answer questions of an impeachable character, and in the making of prior incriminatory statements, on the ground that he had no definite recollection on the subject attempted to be recalled to his mind. He denied that he was under the influence of intoxicating liquor and attributed his unsteadiness of step to the automobile injury above adverted to. He claimed that his mentality was not affected by the head injury further than the recurrence of headaches, but that his knees had not fully recovered their former strength and that he walked with the aid of a cane for some time thereafter. He also denied having any other instruments at hand while making his examination but a speculum, forceps and a pair of scissors. His attempt to account for the instruments found in sterilization is most unsatisfactory and the purposes of his examination, which he frequently spoke of as being superficial, are not clear. He speaks of a suspicion of tuberculosis, manifested by the symptoms of coughing and roughness of the lungs, which he heard upon applying the stethoscope. He described the cervix as appearing to be congested and being blue in color. His testimony carried the suggestion that the patient had been tam-

pered with before he examined her and he also gave out the impression that her tendency to tuberculosis threatened a miscarriage. He made the statement soon after the patient's death that he had treated her a year prior thereto for stomach, heart and nervous troubles. When this statement was called to his attention, he added also "lung trouble". The deceased was an employee in the packing department of a soap factory, who had been temporarily laid off, with others, by reason of a let-down in the output of the factory, and was in good health, as shown by the autopsy, and by the further fact that no one heard her complain or suspected that her health had become in any way impaired. She was the mother of two young children. It would serve no good purpose to attempt an analysis of appellant's testimony, as it completely fails to give a clear, coherent or rational statement of his connection with the fatality.

We herewith repeat appellant's language as to the last chapter of the act in which he was the principal actor:

"Q. All right now, what was done? A. I attempted to introduce the speculum. It was attended with the same objections on her part (deceased) and finally she seemed to quiet down. I did not notice anything in particular at the moment. I finally was successful in introducing the speculum for further examination. Just at that moment I looked over and I saw there was something wrong with her. Smith spoke of it at the same time. She acted as if she was sick; she began to cough very violently. I did not know whether she was sick at her stomach from the camphor and ammonia, or whether it was nervousness or just what it was, so I asked Mr. Smith to reach over on the shelf between the two rooms, and get a little face tray that is used in case of expectoration or vomiting, and he did so. I went around to the head of the table at that time. She began simultaneously to spurt blood from the nose and spitting clots of blood from her mouth into the little basin. I had succeeded in introducing the speculum—I think I have already said that—and just about that time I had a chance to get a good view of the cervix for the first time and I noticed it to be greatly congested. It looked as if it was almost ready to burst with blood. I withdrew the speculum and laid it in the sink. . . . Even at that time I

thought that she had fainted and I could not account for the blood. The only thing I thought of was a pulmonary hemorrhage and I did not see how she could have it at that early stage of the disease, if she had the disease. So I desisted any further examination and removed her from where she was, which was only a couple of steps back to the bed from which she came.''

The witness testified elsewhere that he never thought of embolism.

██ Upon the physical facts positively established by direct testimony, and from which the jury drew inferences which were impelled by reason, this court would be invading the province of the fact-finding body created by law, should it reverse the said implied findings on the ground of the insufficiency of the evidence. Without commenting further on the sufficiency of the evidence, suffice it to say that it stands unassailable against such attack.

██ The indictment was in the usual form, charging murder in general terms. Within its allegations were included all degrees of murder and manslaughter. The jury was so instructed upon request of defendant himself. The court gave thirty-seven separate instructions to the jury, twenty-two of which were given upon the request of the People or by the court of its own motion, and fifteen were given at the request of the defendant. The instructions are full and fair, touching every material question of law involved, including the limitations that should be placed upon statements made by the accused and statements made by the decedent and others as to her condition and her purposes in going to the doctor's office. As to what participation in crime constitutes an accomplice and the degree of corroboration necessary to justify a conviction, and the duty of the jurors to shut out of the case all suspicions and mere probabilities as to guilt in their deliberations, were clearly expressed in appropriate instructions. Certainly the defendant has no just grounds on which to base a complaint against the fullness and fairness of the instructions. The testimony given by the several witnesses as to the appearance of the defendant at the time of and during a period of some two hours immediately after the death of Jenny Rose Peterson was contested by the defense, who examined defendant's nurse, his son, and defendant himself as to his condition of

sobriety. The following instruction was given at defendant's request, clearly for the purpose of reducing the degree of crime from murder to manslaughter: "However, if you find from the evidence beyond a reasonable doubt and to a moral certainty that the defendant performed or attempted an abortion upon the person of Jennie Rose Peterson, and that such abortion was necessary to save the life of the deceased, and that the defendant performed such abortion without proper caution or circumspection and that such failure by the defendant to use proper caution and circumspection was the cause of death of Jennie Rose Peterson, then the defendant would be guilty of manslaughter."

Several other full instructions were given upon request of defendant on the subject of manslaughter. Both the testimony and the instruction as to the condition of defendant as to sobriety were designed to establish a lesser and not a greater offense. Surely he could have no valid objection to testimony and to the instructions which he offered and which would have a tendency to lessen the offense. But, in the final analysis, the mitigatory evidence was not accepted by the jury, as it found him guilty of murder of the second degree and repudiated the evidence which was offered tending to establish manslaughter.

It is contended that the issue that death may have ensued from the performance of a lawful act, without proper caution or circumspection, was not a theory upon which the prosecution tried the case. We have above pointed out that this contention is negated by the evidence adduced by the prosecution and which was contested by the defendant. The indictment included manslaughter; evidence was offered tending to establish manslaughter as well as murder; and the defense offered numerous instructions, which were generally given, defining manslaughter. Section 1127 of the Penal Code makes it the duty of the court to state to the jury all matters of law necessary for their information. Had the court refused or failed to instruct as to manslaughter in the light of the evidence in the instant case, its refusal would, unquestionably, have constituted reversible error. Section 1159 of the Penal Code further provides that "The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged". This court, dealing

with the very question here urged, said in *People* v. *Wright,*
167 Cal. 1 [138 Pac. 349], an abortion case, in part, as
follows: "It is not the 'theory' which the prosecution ad-
vances, nor the 'theory' which the defense adopts which
governs the court in the giving or in the refusing to give
instructions. Theories are of moment in a criminal case
only as they are supported by substantial evidence. What
the trial court is commanded by law to do is to state to
the jury all matters of law necessary for their information
in their deliberations. . . . "

■ We now come to the refusal of the court which
heard the case to sit and determine whether probation
should be granted. The court denied the application on the
ground that the crime embraced those elements which took
it out of the class to which probation extends. Section 1203
of the Penal Code provides that "after the conviction by
plea or verdict of guilty of a public offense in cases where
discretion is conferred on the court or any board or com-
mission or other authority as to the extent of the punishment
the court, upon application of the defendant . . . may sum-
marily, or at a time fixed hear and determine in the pres-
ence of the defendant the matter of probation of the de-
fendant and the conditions of such probation, if granted;
. . . further provided, however, that probation shall not be
granted to any defendant who at the time of the perpetra-
tion of the crime or at the time of his arrest was armed
with a deadly weapon (unless at the time he had a lawful
right to carry the same) nor to one who used or attempted
to use a deadly weapon in connection with the perpetration
of the crime, nor to one who in the perpetration of the
crime inflicted great bodily injury or torture, nor to any
defendant unless the court shall be satisfied that he has
never in any place been previously convicted of a felony,
nor to any public official or employee of the state, county,
city, city and county, or other political subdivision thereof,
who in the discharge of the duties of his public office or
employment accepts or gives or offers to accept or give
a bribe or embezzles public money or is guilty of extortion
in the discharge of his official duty."

It was the effort of appellant to commit an abortion by
means of instruments, a felony in the perpetration of which
human life was destroyed. In the commission of that

crime, the intent was present. The criminal act resulted in the infliction of great bodily injury, death, and the repeated efforts to bring about abortion—continuing through five days—according to the testimony of the nurse, Henry Smith, and the defendant himself, subjected the deceased to great bodily pain and suffering. As above stated, the act resulted in murder of the second degree. The statute, before amended to its present form to include those who in the perpetration of the crime have inflicted great bodily injury or torture, specifically excluded those who had committed murder from its provisions. Each case is to be adjudged by its own facts, and, in the instant case, the trial judge who heard the case had determined that it is not a case in which probation should be granted. *People* v. *Jones,* 87 Cal. App. 482 [262 Pac. 361], and *People* v. *Lovelace,* 97 Cal. App. 228 [275 Pac. 489], are not in point in fact and cannot rule the decision in the instant case.

Judgment and order affirmed.

Richards, J., Curtis, J., Preston, J., Langdon, J., and Waste, C. J., concurred.