[Crim. No. 5485. Second Dist., Div. One. Jan. 30, 1956.]

THE PEOPLE, Respondent, v. ROGER FRED
BRENON, Appellant.

Ward Sullivan for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendant was charged with the murder of Virginia Watson on November 29, 1954, whose death was caused by procedures to produce an abortion. It was also alleged that defendant suffered a prior conviction of felony, conspiracy to commit abortion on November 12, 1953. Defendant's motion to dismiss under Penal Code, section 995, was denied and he pleaded not guilty to the crime charged. The prior conviction was admitted. Trial by jury was waived and the cause was submitted on the testimony adduced at the preliminary examination. Defendant was found guilty as charged and the court fixed the degree of the crime as murder in the second degree. Defendant's motion for a new trial was denied and he was sentenced to state prison. From the judgment of conviction and the order denying his motion for a new trial defendant prosecutes this appeal.

Viewed in the light most favorable to the prosecution (*People* v. *Silva*, 119 Cal.App.2d 421, 422 [259 P.2d 74]) we consider the following as a fair epitome of the salient facts surrounding this prosecution. Dr. Frederick Newbarr, chief autopsy surgeon for the coroner of Los Angeles County, testified that he was in association with

Dr. Cefalu when the latter performed an autopsy upon the body of Virginia Watson on November 30, 1954. That the cause of death was as follows: "local peritonitis, broncho-pneumonia, purulent pericarditis; due to: septic penetration of uterine wall; due to: procedures to produce abortion. Hemorrhage was noted in the uterine area and there was an opening through the uterine wall. A pregnancy was present." In Dr. Newbarr's opinion the penetration of the wall indicated that some instrument had been introduced and had caused a perforation. The deceased's medical history disclosed that there was an induced abortion November 18th, followed by bleeding and vomiting; that a fetus was possibly passed the following day; that on November 26th the deceased had difficulty in breathing and was removed to the California Hospital; that on November 29th she was transferred to the General Hospital.

Arthur Watson, husband of the victim, testified that he lived with his wife and the latter's mother. The witness and his wife had been married some 10 years. She was 32 years of age at the time of her death. Prior to her fatal illness his wife's health had always been good. She was a swimming teacher. Until defendant's visit to the premises on November 18, 1954, Mrs. Watson had never consulted a doctor. Mr. Watson had seen defendant a number of times before November, 1954. Mr. Watson further testified that on November 18, 1954, he returned home at about 5:30 p. m. His wife was there. She told him defendant was coming over. The latter arrived at around 8 or 8:30 p. m. Mr. Watson admitted him to the living room where Mrs. Watson was. The latter requested her husband to leave the room. Feeling that the occasion "concerned a personal matter" on the part of his wife, Mr. Watson complied. When defendant arrived, he was carrying a small bag, perhaps a foot or a foot and a half long. Before leaving the room, Mr. Watson had no conversation with defendant. His wife said that she wanted to be alone and that everything was all right. In referring to defendant, Mrs. Watson used the name Dr. Rogers.

Mr. Watson went to the kitchen and also to the bedroom where his mother-in-law was resting. She had been ill. At one time that evening when Mr. Watson was in the kitchen he saw defendant there. They had no conversation. Mr. Watson saw defendant sterilizing some instruments, that is defendant was boiling them in a pan on the stove. Mr.

Watson saw an instrument which looked something like a vaginal speculum (an instrument normally used by the medical profession for insertion into the private parts of a woman to bring the cervix into view). Mr. Watson saw defendant in the kitchen at a later time. The latter was washing his hands in the sink. Mr. Watson also heard a "clinking noise" on the sink. He had not yet gone back into the living room. Mr. Watson next saw defendant in the living room on the occasion when the latter was leaving. Defendant had been at the premises approximately one-half an hour or three-quarters of an hour. Mr. Watson observed that his wife was sitting on the sofa and was wearing a dressing gown. She asked Mr. Watson to write a check for $150. He did so, writing it to "cash," and handed the check to defendant, who took it and left, opening the door himself. Mr. Watson had had no conversation with defendant concerning money.

In the summer of 1952, Mr. and Mrs. Watson had been living at 1535 North Las Palmas, just down the street from where they were in November, 1954. Mr. Watson had a similar transaction with defendant at that place. The latter came to the house and Mr. Watson paid him a similar amount as on November 18, 1954. Mr. Watson was out of the room during the time anything was done to his wife on that occasion in 1952. ". . . [M]y wife wouldn't allow me around. This is entirely her own doing. She wouldn't have me around at all. She asked me to leave the room." On that occasion, Mrs. Watson referred to defendant as Dr. Rogers. She told Mr. Watson that defendant was a doctor and had studied medicine, and this was all that Mr. Watson knew about it.

Subsequent to the occasion of November 18, 1954, Mrs. Watson became ill. She was very much upset due to her mother's illness. As Mr. Watson recalled, his wife commenced to vomit the following night. Mr. Watson attributed it to the upset in connection with his wife's mother. His wife said she was fine and did not want a doctor. She did not return to work. It was perhaps the following night after defendant's visit that Mrs. Watson asked her husband to get her some sanitary pads. It was about November 27th that Mr. Watson took his wife to a doctor, because she had trouble getting her breath. Following the doctor's examination, Mr. Watson took his wife to the California Hospital. Because of his wife's particular condition, it was suggested that she go to the General Hospital. She was hospitalized at the latter place, where she passed away.

In connection with the testimony of Mr. Watson it might be noted that when called as a witness for the prosecution he, through his attorney, claimed the privilege of not testifying on the ground of self-incrimination and asked that he be permitted to avail himself of the benefits of section 1325 of the Penal Code. The court issued its order directing him to testify, thereby granting him immunity from prosecution for the offense charged against defendant.

Police Officer Herman Zander was one of the investigating officers in the case at bar. He testified that about 11 p. m., on December 2, 1954, he had a conversation with defendant in a room at the Los Angeles city hall. That the conversation was free and voluntary and without any threats or promises. Officer Zander asked defendant if he knew Virginia Watson (the victim, who had been a swimming instructor at a club). Defendant stated that he might have known her, that he had been to the club many times when his father was a member but had not been there the past two or three years, since his father had dropped his membership. Defendant said further that he might have met Mrs. Watson in the bar or one of the clubrooms but that he had no clear recollection of having known her and that he did not recall her at the time. The officer then asked defendant if it was not a fact that Virginia Watson contacted him sometime before the evening of November 18, 1954, that Mrs. Watson told defendant she believed herself pregnant and wished to terminate the pregnancy, that defendant agreed to do so, and went to Mrs. Watson's home on Las Palmas at about 8 p. m., November 18, 1954, that while he was there defendant inserted a catheter into Mrs. Watson's uterus, through which he introduced a solution containing tincture of green soap for the purpose of causing a miscarriage, that such miscarriage was not necessary to save Mrs. Watson's life, and that for all of this defendant received $150. Following these statements of Officer Zander in the form of a question, defendant said, ''I never used . . . a catheter before; I always used a small glass syringe.''

Officer Zander also testified that during the conversation and when reference was made to Mrs. Watson's death, defendant said, ''Is that what you want to talk to me about? Do you think I had something to do with her death?'' to which the officer replied, ''Well, I think you might have some information on it or might know something about it,'' whereupon defendant stated, ''I don't know anything about it.''

Defendant further stated to Officer Zander that he was not at Virginia Watson's home on November 18, 1954. Defendant did not testify at the trial or offer any testimony in his own behalf.

The sole ground advanced by appellant for a reversal of the judgment and order is that the judgment of conviction is contrary to the law and the evidence in that the only evidence incriminating appellant is that furnished by the victim's husband and that there is a total absence of any legal evidence in the record corroborative of the testimony of the husband who allegedly was an accomplice.

In contending that the conviction of the appellant was predicated upon sufficient evidence, respondent earnestly urges that the witness Watson was not an accomplice as a matter of law, but that arguendo if Mr. Watson was an accomplice, his testimony was adequately corroborated to satisfy the requirements of Penal Code, section 1111.

The code section just referred to defines an accomplice as: ". . . one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Penal Code, section 31, defines as principals, "All persons concerned in the commission of a crime . . ., and whether they directly commit the act constituting the offense, or aid and abet in its commission . . .."

The first question presented is whether, under the foregoing Penal Code sections, the witness Watson was an accomplice as a matter of law. His connection with the offense charged against appellant may be summarized as follows: On the date in question, Mr. Watson arrived home about 5:30 p. m. His wife informed him that appellant was coming. He admitted the latter and observed he was carrying a bag. He acceded to his wife's request that he leave the room because he felt "this was a personal thing on the part of my wife." The witness observed appellant sterilizing some instruments in the kitchen and later washing his hands. At the request of his wife, the husband wrote a check for $150, payable to "cash," and which he delivered to appellant. That following his wife's death, and when he received the cancelled check from the bank, he destroyed it. When the witness was later interrogated by police officers he did not tell them that appellant was at his home on November 18, 1954, and several times he disclaimed knowledge of his wife's condition. When called as a witness at

the trial of appellant, Mr. Watson availed himself of the constitutional protection against self-incrimination.

In support of his contention that under the foregoing facts the husband was an accomplice as a matter of law, appellant relies heavily upon the case of *People* v. *Wilson*, 25 Cal.2d 341 [153 P.2d 720], which involved a prosecution for abortion and in which one of the questions presented was whether the husband of the victim was an accomplice whose testimony required corroboration (Pen. Code, § 1111). In that case the court said at page 346: ''The mere fact that he accompanied his wife to defendant's office does not make him an accomplice (citing cases). Mr. Anderson, however, also provided the $100 fee for the abortion and had a conversation with defendant in which he assured her that the money was ready and inquired of her how long he would have to wait, thus showing his intention to facilitate the commission of the crime by being at hand to take his wife home. He stated that he knew the purpose of his wife's appointment with defendant was an abortion. When he was asked whether he took his wife to defendant's office for the purpose of an abortion he answered that 'that was more or less up to her.' *This evidence shows that he played an active part in the transaction and was therefore subject to prosecution for the offense with which defendant was charged.* (Pen. Code, § 31; *People* v. *Shaw*, 17 Cal.2d 778, 799 [112 P.2d 241]), and was therefore an accomplice within the definition of section 1111 of the Penal Code. (*People* v. *Clapp*, 24 Cal.2d 835, 838 [151 P.2d 237].)'' (Emphasis added.)

We are persuaded that the facts of the case now engaging our attention are not analogous with those of the case just cited for the reasons as stated by respondent: ''Mr. Watson had no conversation whatsoever with appellant on the occasion in question. Mr. Watson did not take Mrs. Watson to appellant; appellant came to the Watson house. It was from Mrs. Watson that Mr. Watson learned appellant was coming to the house. As soon as appellant came, Mrs. Watson directed Mr. Watson to leave the room. While Mr. Watson did write a check for $150 at his wife's request and give it to appellant, this was after appellant had concluded what he was doing with respect to Mrs. Watson. Mr. Watson still had no conversation whatsoever with appellant.''

In *People* v. *Darrow*, 212 Cal. 167, 172, 173 [298 P. 1] (a prosecution for murder resulting from an attempt to commit an abortion), one Smith testified that the deceased had told

him of her pregnancy and of her desire for an operation; that he sought to dissuade her; nevertheless, that they went to the defendant; that he, Smith, paid the defendant's fee and administered an anesthetic to the deceased through the two operations on consecutive days. The Supreme Court stated at page 169: ". . . We are also in accord with that portion of the decision of the District Court of Appeal which holds that the trial court properly refused to instruct the jury that Smith was an accomplice as a matter of law, but, instead, left the jury free to determine that question 'as the evidence did not conclusively establish the relation of Smith to the defendant as that of an accomplice.' "

In *People* v. *Malone*, 82 Cal.App.2d 54, 68 [185 P.2d 870] (a prosecution for performing abortions), it was concluded that a Mrs. Prusack (who had accompanied the complaining witness (in one of the abortion counts) to the defendant's office, talked with him about the fee, and was present while the defendant was working on the witness, was not an accomplice as a matter of law. The appellate court cited *People* v. *Darrow, supra,* and *People* v. *Alvarez*, 73 Cal.App.2d 528 [166 P.2d 896]. In the Alvarez case, *supra* (also a prosecution for abortion), the appellate court noted that the sister-in-law of the prosecutrix (Rebecca) purchased the catheter which the defendant used, prepared the room for the operation and allowed the defendant to come to her home for the purpose of the operation; and that the sister of the prosecutrix buried the remains of the aborted birth. The appellate court stated at page 532: "As to the adequacy of their testimony to corroborate Rebecca, the most that could be said to its disfavor is that it was a question for the trial court to determine whether they were accomplices. (*People* v. *Darrow*, 212 Cal. 167, 169 [298 P. 1].) In the Darrow case the trial court submitted to the jury the question of whether the witness who paid defendant's fees was an accomplice. Such action was approved since the evidence did not conclusively establish the relation of the witness as that of an accomplice even though he administered the anaesthetic through two operations on successive days."

We are satisfied that the evidence in the case at bar does not establish that the husband, Mr. Watson, played *an active part* in the transaction and was, therefore, subject to prosecution for the offense charged against appellant and accordingly was, as a matter of law, an accomplice within the purview of section 1111 of the Penal Code. Since the

evidence did not conclusively establish the relation of Mr. Watson to appellant as that of an accomplice, the trial judge was free to determine that question, and to conclude, as he did, that section 1111 of the Penal Code was not applicable.

The foregoing narrative of the evidentiary features of this case discloses ample proof of appellant's guilt and is sufficient to sustain the conclusion arrived at by the trial court.

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each is, affirmed.

Doran, J., and Fourt, J., concurred.