323 P.2d 397]

[Crim. No. 6127. In Bank. Mar. 26, 1958.]

THE PEOPLE, Respondent, v. MAX OSSLO et al.,
Appellants.

82

Aaron Sapiro, Charles M. Arak and Charles P. Scully for Appellants.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendants were charged with (count I) "Conspiracy to Commit the Crime of Assault (PC 182)" and (count II) "Assault by Means of Force Likely to Produce Great Bodily Injury (PC 245)." A jury found them guilty as charged. Imposition of sentence upon defendants Osslo, McFaden, and Meyer was suspended and they were granted probation. Judgments of conviction were entered against defendants Hazel, Cacio, Dempster, Dimitratos, and Tucker. Defendants' motion for new trial was denied. Defendants appeal, respectively, from the probation orders and judgments, and from the order denying their motion for new trial. They present a multifold attack upon the orders and judgments. Defendants urge that the evidence is insufficient; that there was prejudicial error in the admission and exclusion of evidence; that the charge of conspiracy to commit the crime of assault is not a charge of a crime known to the laws of this state; that there was prejudicial mis-

conduct of the prosecuting attorney; that the punishment imposed upon defendants Osslo, McFaden and Meyer is improper and excessive; and that the case was erroneously channeled into a particular department of the superior court. For the reasons developed in the ensuing discussion we have concluded that these contentions are without substantial merit except that one of the terms, hereinafter described, of the orders granting probation to Osslo, McFaden, and Meyer is erroneous, and that the orders should be modified by striking out the erroneous provision.

The conduct and incidents involved in this prosecution arose out of a jurisdictional dispute in San Diego County between the local Butchers' Union and the local Retail Clerks' Union. Preceding this dispute members of the Clerks' Union employed in markets which stocked frozen and packaged dinners had handled the sale of such dinners. The Butchers' Union determined that its members rather than members of the Clerks' Union should have the handling of the frozen dinners which included a meat or poultry serving, and demanded that the markets govern their employes accordingly. The Butchers claimed "violation of contract" by the markets permitting Clerks to continue handling the dinner items and called a strike at one of the markets.

The Clerks endeavored to have the dispute settled through legal proceedings. About October 5, 1955, the secretary-treasurer of the Clerks' local wrote "to the market operators informing them of the jurisdictional dispute and the stand the Clerks were taking." Representatives of the Butchers and the Clerks met a few days prior to October 12 (according to one witness, prior to October 8). The secretary-treasurer of the Clerks' local "made demand upon Mr. Osslo [who held various offices, hereinafter detailed, with the Butchers] to cause to have the merchandise in dispute at Ferguson's market, as an example, placed back under the jurisdiction of the Clerks, or our organization would take *every legal means* necessary to enforce the jurisdiction." (Italics added.) Osslo "pounded the table three times, stated he was boss of the West Coast and he would fight for jurisdiction."

On October 18, 1955, four days before the assault of which defendants stand convicted, the Clerks filed with the National Labor Relations Board a petition "for the purpose of having the Board determine who the jurisdiction belonged to."

In contrast to the efforts of the Clerks to settle the controversy by legal proceedings, and inferentially to carry out

the declaration of Osslo that "he was boss of the West Coast and he would fight for jurisdiction," the Butchers, assertedly for the purpose of providing "observers" to accompany Butchers' representatives and assist in "inspecting" markets which were permitting, or suspected of permitting, grocery clerks to sell the packaged foods, imported defendants Hazel, Cacio, Dempster, Dimitratos, and Tucker, hereinafter sometimes called the sailor defendants, from San Francisco and started calling on the markets.[1] The hereinafter described brutal assault and battery upon Maurer, a business agent for the local Retail Clerks, followed.

The evidence, pertinent portions of which are hereinafter summarized or quoted, is in some respects substantially conflicting, but in every respect is ample to support the verdicts. If the jury believed the prosecution witnesses and disbelieved the testimonies of those defendants who took the stand, they properly could have felt that the cumulative effect of the evidence was not only sufficient, but overwhelming. Study of the record constrains us to conclude that the latter view is correct. "The rule applicable where there is evidence, circumstantial or otherwise, that a crime has been committed and that the defendant was the perpetrator thereof, has been many times reiterated by the reviewing courts of this state as follows: The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . We must assume in favor of the verdict the existence of every fact which the jury could

---

[1]The Clerks, too, had persons from elsewhere than San Diego assisting them in connection with the jurisdictional dispute, but they were members of the Retail Clerks' Union and they did not become involved in violence. "They accompanied the local business agents here on field trips to observe where the merchandise was located in the markets that was in dispute and to assist in making diagrams of the stores, also to assist the local men in getting petitions signed to submit to the National Labor Relations Board."

have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (*People* v. *Daugherty* (1953), 40 Cal.2d 876, 885 [256 P.2d 911].)

Defendants' contentions require a rather extensive review of the evidence in order that they may be viewed and resolved in fair perspective to the entire case.

*The Evidence.* James Ray Jackson, a business agent for the Butchers, testified for the prosecution as a rather reluctant witness. His testimony, read as a whole, and in the light of the entire record, leads inevitably to the inference that the sailor defendants, Dimitratos, Cacio, Tucker, Dempster, and Hazel, who were neither members of the Butchers' Union nor residents of San Diego, were employed by the Butchers with the expectation that they would engage in acts of violence, although in terms Jackson insisted that they were employed merely as "observers." The substance of Jackson's testimony is as follows:

Jackson's duties as business manager were "to sign contracts, work on grievances, check violations" and "I do organizing . . . and any other work that is necessary to do." During the 18 years Jackson had been a member of the Butchers, defendant Osslo had been secretary-treasurer of the San Diego local to which Jackson belonged. Osslo was president of the Western Federation of Butchers, the affiliated butchers' unions of California; and a member of the board and executive committee of the International Butchers' Union at the time of the assault and battery (October 22, 1955). In June, 1956, Osslo was elected vice president of the International. Membership in the Butchers in the United States was about 300,000. Defendant McFaden had been a business agent of the San Diego local since 1941 and defendant Meyer had been a business agent since 1955.

About September 8, 1955, there was a strike of the Butchers at the Food Basket Market because of an asserted "violation of contract" in that certain prepared and packaged complete dinners included meat items and such packages were being handled by the Clerks in the grocery department rather than by the Butchers. As a result of the strike the Food

Basket Market brought an injunction suit against the San Diego local of the Butchers. The court ordered that the disputed prepared dinners be taken off sale. It may be inferred that a purpose of the order was the prevention of the sort of violent altercation which, as hereinafter related, forms the basis of defendants' conviction of assault.

Concerning the relations between the Clerks and the Butchers at the time of the Food Basket strike, Jackson testified as follows:

"Q. Now at Food Basket, . . . did you talk with the Clerks representative while you were on strike at Food Basket, by any chance? A. Yeah, I guess we did. General conversation. . . .

"Q. Let me ask you this: Were you present at any conferences at which any of the Clerks representatives discussed the Food Basket situation with Mr. Osslo? A. Sir, I had my foot broken the day before anything like that was discussed, I believe. . . .

"Q. Do you, of your own knowledge, know whether or not any discussions were held between Mr. Osslo and representatives of the Retail Clerks Union? A. When?

"Q. After and at about the time of the Food Basket incident. A. No, sir. . . . I don't know. . . .

"Q. Now when was the contract that was in effect at Food Basket up for renewal? A. November. . . .

"Q. Yes. Now what are your functions as a business agent; just what do you do? A. My duties are to get—to sign contracts, work on grievances, check violations. . . . I do organizing, work on grievances, sign contracts, and any other work that is necessary to do."

On October 12, 1955 (a Wednesday), the Clerks struck Ferguson's Market. Jackson and McFaden went to the market. Approximately 25 clerks were present, among them Mr. Montgomery, hereinafter mentioned as one who was attacked but succeeded in escaping serious injury in the subsequent assault of October 22, 1955. In addition to the members of the Butchers who worked at the market, defendant McFaden, and Jackson, two or three other members of the Butchers' Union were present. The Clerks "gave us [the Butchers] some pretty good looks." Jackson felt that these "looks" were threatening.

Discussions were had by the Butchers as to what they would do at stores where the Clerks walked out. Defendant Osslo was present at these discussions.

Sailors Dimitratos and Hazel arrived in San Diego by airline from San Francisco on Saturday, October 15, 1955. On the following Monday they met with defendants McFaden and Meyer and the witness Jackson. Defendant Osslo had previously stated that Harry Lundeberg ''was sending a couple of fellows down to help us out, go with us, be our observers, and see that we weren't jumped from behind, or bothered.'' ''[T]hey were to accompany us and work with us.'' There were older, unemployed members of the Butchers who could have acted as observers but they were not called upon to do so. The sailors ''were going to observe and——

''Q. Observe what? A. Observe what was going on.

''Q. What were they to do after they observed what was going on? A. To protect us and see that nobody created any trouble or violence or anything of that sort.''

The witness did not call the police for protection; he did not know whether anyone else had done so.

''Q. Were the men from San Francisco, the sailors, more proficient, to your knowledge, than the San Diego Police Department? A. Well, I don't know. Maybe they might be for labor work. They know what to look for.

''Q. You mean that they are experienced in this type of an action, or this matter? A. What action are you talking about, sir?

''Q. Well, in coming down and being observers. You mean they were more experienced in that line of work? A. I believe they would be.

''Q. Than a police officer might be? A. I believe they would be, yes.

''Q. In what respect would they be more proficient? A. They worked in labor for a good many years. That is their job, working as laboring people.

''Q. What are they going to observe? I am kind of interested in that. What are they going to observe that an older dues paying member [of the Butchers] couldn't observe? A. They could observe what goes on.

''Q. I see. In other words, what that takes is a good pair of eyes? A. It takes a little brains, too.

''Q. Well, a man that has been a master craftsman and worked up to a head meat cutter would have those qualifications, wouldn't he? A. Some might. Most of them might.

''Q. What were they to do after they observed? Were they to make any reports? A. Yeah.

". . "Q. To whom were they to report? A. I guess they would make them to our Secretary?. .

"Q. Mr. Osslo? A. And to the Western Federation of Butchers or the State Federation of Labor. . . .

, "Q. What are you looking for to observe? I am not clear on that or on these reports. Did they make any reports, let me ask you that? A. They reported on what they knew and saw.

"Q. They were oral reports, were they? A. Yes.

"Q. How often did they make the reports?. A. I guess daily. . . .

"Q. What I am interested in, Mr. Jackson, is this: . . . why, if you are looking for just observers to go around and find out what is going on, didn't you give any preferential treatment to the local people in San Diego in other unions? A. Well, sir, not that I know of.

"Q. Here is what I want to know: why is the Sailors Union selected as the ones you are going to go to to get observers? A. Well, I would assume that the reason is—I don't know for sure—these fellows are out on a ship and they come back in and they have got time on their hands waiting around for another ship.

"Q. Did you check any other labor hiring halls here in town, the laborers union, the plasterers union, or—— A. I didn't.

"Q. Do you know whether or not anybody else checked any of the other labor hiring halls locally to see if there were any people available that could be employed as observers? A. I don't know, sir.

"Q. To your knowledge was that done? A. No, sir."

"[W]e had told the other labor organizations in San Diego what was going on. Indirectly that is asking for help and aid. As far as specifically asking for the loaning of a man or two men or more, I don't know of that being done, sir."

· "Q. What did Mr. Osslo say about the two men that were coming down, if anything? . . . A. He said they were coming down to go around with us. . . .

"Q. What did you do when you went around to these stores and what did they do to earn this $150.00 a week plus expenses [the amount which the sailors were paid by the Butchers]? A. They were with us. . . .

· "Q. Tell me what the work was they were doing? A. Checked the markets.

"Q. What do you do when you check a market? How did

they know about a violation? They are sailors, aren't they? A. They know what they are looking for.

"Q. What were they looking for? A. A violation of our contract in the meat department.

"Q. How did they know a violation of a contract if they just flew in from San Francisco and had a short meeting with you? Is it that easy that you can become a business agent? A. As I said before, . . . they were here to go with us, act as observers and to protect us in case there might be any violence. . . .

"Q. If there was a contract violation. How would they know what the contract was? A. We would have to tell them.

"Q. You would have to tell them what was in your contract? A. Point out the items, if there is a violation on the items.

"Q. These men are sailors and here is what I am confused about, and I would think an old timer in the meat business would have been important to you. What instructions did you give these men from San Francisco that made them proficient in a short period of time to be able to observe these contract violations, if there were any? A. The violations part of it wasn't necessarily their objective to observe. They were sent down here, or called down here, to protect us, as I said before, and see we weren't jumped from behind, or jumped at all.

"Q. And the services of the San Diego Police Department, which are free, weren't ever used in that respect? . . . A. I did not call the police department, no, sir. . . .

"Q. Were you in any way threatened? A. By certain gestures, yes, sir.

"Q. When were you threatened by certain gestures? A. At Tang's Market.

"Q. That is after Dimitratos and Hazel are with you, isn't it? A. Yes, sir.

"Q. I am talking about before, before these men are hired what gestures were made that caused you personally to feel that you had been threatened. A. The incident at Ferguson's. . . . I was in the alley between the truck and the building when several of them walked back. . . .

"Q. What did they do? A. Actually nothing but give us a good look. . . .

"Q. That scared you? A. It could have been a threatening look, yes, sir. . . .

"Q. Well, who did you report the threatening looks you

got in the alley way at Ferguson's to? A. I believe they were all reported to each other, Brother Osslo, myself and Mack and Brother Meyer.

"Q. Did you ever report those threatening looks to the police department? A. I did not, no, sir.

"Q. As a matter of fact, you weren't even concerned with them, were you? A. Well, no, sir. . . . [After the question was read and reread] I was concerned. . . .

"Q. You didn't report it to the police? A. There is not much to report, sir."

"Q. . . . In the particular market how would they [Dimitratos and Hazel] know [which items were to be handled by the Butchers], just walking into the place? A. They wouldn't necessarily. They were with me or some of the rest of us. . . ."

McFaden arranged for hotel reservations for Dimitratos and Hazel and a few days later, when the additional three sailor defendants (Cacio, Tucker and Dempster) were imported from San Francisco, arranged for their reservations.

The sailor defendants each received $150 a week plus airline transportation, hotel accommodations and expenses from the Butchers. The salary of a beginning apprentice butcher was $72 a week. The "top rate" which a journeyman butcher was paid was $102 a week. A head meat cutter received $107 a week. Jackson, as business agent, received $140 a week.

Dimitratos and Hazel attended union meetings of the Butchers. Such meetings were not open to the public but "We have visitors. Anyone working for the organization is permitted," and frequently visitors not connected with the union were invited.

At Tang's (sometimes called Ming's) Market a representative of the Clerks assertedly threatened the witness Jackson by telling him that the Clerks "were taking everything that bleeds, all the red meat, everything. That is not only a threat to me, that is a threat on the organization, the way I took it. . . .

"Q. Did you report it to the police department? A. No, sir.

"Q. Did you report it to Mr. Osslo? A. Yes, sir. . . . I reported to McFaden and he, in turn, reported it, and Mr. Dimitratos and Mr. Hazel were there."

At Tang's Market one Butler, a Clerk, assertedly "displayed" a knife. Counsel asked:

"Q. Now was there any display of a knife? A. Yes, sir. . . .

"Q. And what was Butler doing with the knife? A. Play-

ing with it, fumbling it, handling it . . . he [was] cleaning his fingernails with it . . .

"Q. What did Butler do with the knife when you came over . . . and were introduced to him? A. He didn't have the knife in his hand at that time, sir." He had been "say twelve to fifteen feet" away when the witness saw him with the knife. Mr. Anderson, another representative of the Clerks, "came storming in," according to the testimony of Dimitratos; the bulge of a gun was visible "On his left arm pit up in the shoulder . . . You could just about see the shape of it." But apparently no one claimed to have actually seen a gun. The testimony of Mr. Jackson continues:

"Q. Did Mr. Anderson threaten you at all? A. Only in a way that he carried himself.

"Q. How did he carry himself? A. Pushed his way through . . . the crowd, through the store.

"Q. Who did he push? A. He didn't push anyone. I say pushed his way through."

When Jackson's recollection was refreshed he admitted that he had testified before the grand jury that at Tang's no threats were made to him or in his presence.

After the incidents at Tang's Market, defendants Cacio, Tucker, and Dempster were also hired by the Butchers and brought from San Francisco to San Diego.

At about 11 o'clock on the morning of October 22 the five sailor defendants together with McFaden, Meyer, Jackson, and one Woodard, an International representative of the Butchers, went to Ferguson's Market. This was the first occasion that Cacio, Dempster, and Tucker went out with the Butchers. There was a slowdown in the meat department for about 40 minutes. Ferguson's was said to be "one of the sensitive points" in the jurisdictional dispute. The group of Butchers' representatives accompanied by their five sailor employes then went to two other markets, in each of which they remained only a few minutes. The sailors assertedly were present "as observers, witnesses, whatever you want to call it." The group returned to Ferguson's Market and "started a conversation" with one of the proprietors. Standing in the market were Montgomery and Maurer. The proprietor pointed out Montgomery and Maurer as Clerks.

The testimony of various witnesses as to how many of the sailors actively participated in the ensuing assault and battery is conflicting. However, the following direct evidence supports a determination that all five of the sailor

defendants actively participated: These five defendants surrounded Clerks Montgomery and Maurer and some of the defendants stomped on Montgomery's and Maurer's feet. "Dimitratos and Hazel attempt[ed] to get Montgomery, but he . . . [though pursued] got away and they stepped right back out . . . Maurer couldn't get . . . past the customers because of a railing and a bunch of pushcarts . . . and he was being pursued . . . until two men got hold of him and held him . . ." Cacio struck Maurer in the stomach. Dempster and Tucker pinned Maurer's arms to his sides. "Dimitratos judo chopped him terribly, fifteen or twenty shots," and "Hazel was bombing in with his fists and with judo chops." Maurer was beaten and kicked. "[W]hen they let go and dropped him to the floor he was in kind of a hulk lying on his side. That is when Cacio used the boots on him. . . . Kicked him in the back twice and then he flopped over on his back and he was kicked, I think, right in the side terribly hard." The witness then "Checked to see if the police were called, checked to see if the ambulance had been called."

Defendants' argument that there is no "credible" evidence that Dempster, Dimitratos, and Hazel participated in the assault is obviously completely devoid of merit when presented to a reviewing court. Such argument goes to the weight of the evidence, and resolution of the conflicting evidence is for the trier of fact. (*People* v. *Daugherty* (1953), *supra,* 40 Cal.2d 876, 885.)

McFaden, Meyer, Jackson, Woodard, and the five sailor defendants had gone to Ferguson's Market in two cars; some of the Butchers and some of the sailors were in each car. When they fled from the market after the assault and battery, the sailors left in one car and the Butchers left in the other car.

A cashier at the market had obtained the license number of the car in which the sailors fled. A boy also attempted to write down the license number but one of the defendants snatched it from the boy's hand. Police officers, immediately notified of the license number, stopped the car, arrested the sailors, took them to the police station, and questioned them.

Defendant Dempster stated to the police that although he had been at Ferguson's Market he knew nothing about a fight there. He also falsely denied that he had any connection with the Butchers. He stated that he had come from San Francisco on a vacation.

Defendant Tucker at first refused to answer police questions

about whether he had been at Ferguson's Market. He stated that he had come to San Diego to do some drinking and to visit Tia Juana. In a subsequent conversation with the police Tucker stated that he had been at Ferguson's Market and that there had been a fight but denied that he or his friends were involved in the fight. He also falsely denied that the Butchers had hired him.

Defendant Dimitratos stated to the officers that he had come to San Diego for a vacation; that neither he nor the group he was with were involved in the fight to his knowledge. On the witness stand he admitted prior conviction of felony and that he made false statements to the officers.

Defendant Cacio told the officers that he had been drinking; that he vaguely remembered being hit or kicked, but that he did not remember hitting anyone. He denied knowing who Jackson and defendant McFaden were and also falsely denied that he was employed by the Butchers.

Defendant Hazel told the officers that he was in San Diego on a vacation and had no interest in unions; that he and defendant Dempster had gone into Ferguson's Market to buy cough drops; that he knew nothing of any fight; and that he did not know McFaden or Jackson.

On November 27, 1955, defendant Meyer told a police officer that he had not been at Ferguson's Market on October 22.

■ The foregoing statements of defendants to the officers concerned matters which were within the defendants' own knowledge, they related materially to the issue of their guilt or innocence of the offenses of which they now stand convicted, and they were manifestly false through deliberate and willful intent. Such falsifications cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances, and thus are admissions of guilt. (*People* v. *Darrow* (1931), 212 Cal. 167, 177 [1] [298 P. 1]; *People* v. *Tolson* (1952), 109 Cal.App.2d 579, 581 [2] [241 P.2d 32]; *People* v. *Farrell* (1951), 107 Cal.App.2d 25, 29 [2] [236 P.2d 424]; see also *People* v. *Wayne* (1953), 41 Cal.2d 814, 822-823 [4, 5] [264 P.2d 547]; concurring opinion of Mr. Justice Traynor in *People* v. *Albertson* (1944), 23 Cal.2d 550, 581-582 [147 P.2d 7].)

At the trial defendants Hazel, Dimitratos, Cacio, and Dempster testified. Defendants Osslo, McFaden, Meyer, and Tucker did not take the stand.

The Butchers paid bail bond fees of $4,500 for the sailor defendants. They paid $10,000 to a private investigator for an investigation of this matter.

It must be borne in mind that the jurors not only heard the evidence which has been summarized but also had the benefit of observing the defendants and the witnesses from day to day during the trial, and that the record shows the receipt in evidence of 59 exhibits. These exhibits include pictures of the scene of the assault, records of telephone calls among the defendants, and records of expenditures of the Butchers on behalf of and to the sailor defendants.

Defendants do not dispute that the overt acts charged in the conspiracy count of the indictment were proved.[2] But they urge that it does not appear that these overt acts were a part of a conspiracy. It is true that there is no *direct* evidence of a conspiracy; all the direct evidence bearing on the question is to the effect that the defendants who actually participated in the assault and battery had been instructed to avoid the use of violence. ▮ But ''A conspiracy can generally be established only by circumstantial evidence. It is not often that the direct fact of a common unlawful design can be proved other than by the establishment of independent facts bearing on such design.'' (*People* v. *Robinson* (1954), 43 Cal.2d 132, 136 [1] [271 P.2d 865]; *People* v. *Steccone* (1950), 36 Cal.2d 234, 237-238 [2, 3] [223 P.2d 17]; cases

[2]Those acts are as follows:

No. 1. That defendant Osslo had a conversation with Harry Lundeberg on October 13, 1955.

No. 2. That Dimitratos and Hazel came to San Diego on October 15, 1955.

No. 3. That McFaden, at the request of Osslo, made reservations for three rooms about October 14.

No. 4. That McFaden, Dimitratos, and Hazel met on October 15.

No. 5. That Hazel and Dimitratos met at the Butchers' local on October 17.

No. 6. That Dimitratos, Hazel, Meyer and other representatives of the Butchers met at Tang's Market on October 18.

No. 7. That Dempster, Cacio, and Tucker met in San Diego on October 21.

No. 8. That Dempster, Cacio, Tucker, Dimitratos, and Hazel met in San Diego on October 21.

No. 9. That Dimitratos, Cacio, Tucker, Dempster, and Hazel accompanied McFaden and Meyer to Ferguson's Market on October 22.

No. 10. That Dempster, Cacio, Tucker, Dimitratos, and Hazel were in an automobile leased by the Butchers on October 22.

Nos. 11 through 15. That Osslo or McFadden agreed to pay each of the sailor defendants a weekly salary and expenses.

collected in 5 McKinney's New Calif. Digest, Conspiracy, § 23.)

Undisputed evidence establishes the following facts: After the jurisdictional dispute between the Butchers and the Clerks began, and prior to the assault here, prosecution witness Jackson and defendants Osslo, McFaden, and Meyer, and representatives of the Butchers, met with representatives of the Clerks; Osslo said that the Butchers were going to "show" the Clerks; he said that he was "top man" on the west coast and "that was it." Anticipating violence—assertedly that representatives of the Butchers would be "jumped" by the Clerks—Osslo, through the Sailors Union of the Pacific, imported and employed the five sailor defendants, and defendants McFaden and Meyer assented to their employment. Dimitratos, Hazel, Tucker, and Dempster had been members of the Sailors Union of the Pacific for a number of years, and Cacio, a Teamster, had sailed in the Merchant Marine. Members of the Sailors Union of the Pacific had participated in other labor disputes to which that union was not a party and had committed an assault and battery in connection with one such dispute.

It is a reasonable inference that Osslo, McFaden, and Meyer, who had been actively and extensively engaged in union affairs, knew of such participation and assault and battery. Pretending concern for their own safety, but never asking police protection, Osslo, with the assent and aid of McFaden and Meyer, set up a situation which inferentially was designed to, and which clearly did, increase the likelihood of violence in the jurisdictional dispute. On a view of the evidence favorable to the prosecution, which the law at this stage of the proceeding requires of us, it is fairly inferrible that Osslo, McFaden, and Meyer at least tacitly understood, anticipated, and agreed that the remaining five defendants would not merely be present to act as "observers" and protect the Butchers from violence, but would and should initiate the violence, which they subsequently did initiate, to "show" the Clerks that Osslo indeed "was boss of the West Coast and he would fight for jurisdiction" and "that was it."

*Admission and Rejection of Evidence.* Defendants urge that it was prejudicial error to admit evidence that members of the Sailors Union of the Pacific participated in other labor disputes to which that union was not a party, and that some of such members (not the defendants here) were guilty of assault and battery in connection with their partici-

pation in such a dispute. This evidence, in the light of the other circumstances, including the prior activities of Osslo, McFaden, and Meyer, was properly admitted as tending to show that the last named defendants contemplated that the employment of the sailor defendants probably would result in acts of violence by the latter defendants.

Evidence was received concerning fights, unconnected with union activities, in 1951 involving Dimitratos and in 1952 involving Dimitratos and Dempster. The evidence was expressly received as to the conspiracy charge only. The trial judge so instructed the jury at the time it was admitted. He further then instructed them that if they believed the evidence ''it would only tend to show the characteristics of a particular defendant in this case, and if that characteristic goes to the offense and if a conspiracy is shown, it would be binding on all the defendants so far as the conspiracy count is concerned.'' The theory on which this evidence was received is erroneous. That Osslo, with McFaden and Meyer, employed persons who had previously participated in fights unconnected with union activity does not tend to show that those persons were hired with the expectation that they would commit assaults connected with union activity, for there is no showing that Osslo, McFaden, or Meyer knew of the 1951 and 1952 altercations. However, in view of the ample evidence that Dimitratos and Dempster participated in the assault and battery here material, and in the light of the circumstances surrounding their importation and employment, it does not appear that the jury could have been misled by evidence that they had been involved in other altercations.

Defendants complain of the admission of evidence of many telephone calls between the defendants and other members of their organizations. This evidence was properly received to show defendants' association; that that association was criminal is shown by the other evidence, viewed as a whole.

Defendants complain of the admission in evidence of the testimony of a police officer concerning the arrest of Clerks Anderson and Weathers on November 1, 1955, after the assault of which defendants were convicted. This testimony was as follows: Defendant Osslo told the officer that his life had been threatened by Anderson. The officer located Anderson and Weathers was with him. At the officer's request Anderson and Weathers accompanied the officer to the police station. The district attorney, after deputies examined an

affidavit furnished by the Butchers on which their charge was based, refused to take action in the matter. The city prosecutor filed charges against Anderson, but they were dismissed. This testimony tends to show that defendant Osslo, after the assault, attempted to harass the Clerks by unsubstantiated accusations and to distract emphasis from the charges against him by countercharges; it was thus admissible as tending to show that Osslo was a conspirator carrying on an effort to make good his declaration that he "was boss of the West Coast and he would fight for jurisdiction," and not, as he argues, the innocent employer of persons who were to act as "observers" or at the most to show the Clerks that the Butchers were protected, without the exercise of force.

Defendants complain that the trial judge refused to permit Jackson to testify that on October 13, 1955, defendant McFaden reported to Jackson and defendant Osslo that he had been frightened by a group of Clerks at Ferguson's Market. This testimony was relevant to the purpose of the employment of the sailor defendants and should have been admitted, but in the light of the entire record its exclusion certainly did not prejudice defendants.

*The Crime of Conspiracy to Commit Assault.* Defendants urge that the charge of "Conspiracy to Commit the Crime of Assault (PC 182)" is not a charge of a crime under the laws of this state because no statute prescribes a punishment for such a crime. Section 182 of the Penal Code provides in material part:

"If two or more persons conspire:

"1. To commit any crime. [Subdivisions 2 through 6 enumerate specified objects of criminal conspiracy.] . . .

"They are punishable as follows: [The next three paragraphs prescribe the punishment for conspiracy to commit crimes against certain officials, for conspiracy to commit any other felony, and for conspiracy to commit two or more felonies which have different punishments.] . . .

"When they conspire to do any of the other acts described in this section they shall be punishable by imprisonment in the county jail for not more than one year, or in the State prison for not more than three years, or by a fine not exceeding five thousand dollars ($5,000) or both."

According to defendants, conspiracy to commit a misdemeanor assault is not one of the acts "described in this section." But, as defendants concede, it was held in

*Doble* v. *Superior Court* (1925), 197 Cal. 556, 565 [2] [241 P. 852] (where the question was whether section 182 of the Penal Code provided punishment for a conspiracy to violate the Corporate Securities Act), that "it was the legislative intention that the words 'any crime' should include all crimes—whether felonies or misdemeanors—which are known to the laws of this state and whether defined and made punishable by the Penal Code or by any other law or statute of this state," and (p. 566 [5] of 197 Cal.) "the words 'any of the other acts described in this section' were meant to, and do in fact, include all other conspiracies to commit crimes or acts prohibited by the section [182] regardless of whether they are denounced by subdivision 1 or any other subdivision thereof." We conclude that the Doble case is applicable here.

*Misconduct of the District Attorney.* Certain specifications of misconduct of the prosecuting attorney, hereinafter discussed, present the most nearly substantial basis for attacking the verdicts, but the evidence so overwhelmingly supports the implied findings that it does not appear reasonable to believe that the misconduct was a contributing factor in the jury's arriving at such verdicts.

Defendants complain of a press release of the prosecuting attorney which was published before trial. This press release stated that the defendants were attempting to delay trial. In this connection the record indicates that on the day the case was to have gone to trial in the regular criminal department (Department 4), that department was engaged in a trial. The presiding judge in Department 2 was willing to select a jury to be used for actual trial in Department 4 and for that purpose the case was transferred from Department 4 to Department 2. Defense counsel announced defendants' willingness to be tried in Department 2, either with or without a jury, but objected to having a jury selected by one judge and then having the actual trial proceed before another judge. The case was thereafter continued in Department 2 from time to time for a week until Department 4 was available for selection of the jury and further trial. The press release to the effect that defendants were attempting to delay the trial appears unfair; defendants were merely objecting, as they had a right to do, regardless of whether their objection was or was not meritorious, to the procedure (described by the presiding judge as "standard procedure in this County") of having a jury selected by one judge and the actual trial conducted by another judge. However, it does

not appear that the newspaper statement prejudiced defendants in the eyes of the jury which tried their case. The trial judge, in accord with the request of defendants' counsel, specifically admonished the jurors to pay no attention to this article and generally admonished them to pay no attention to newspaper articles.

During the *voir dire* examination of the prospective jurors the prosecuting attorney asked such questions as, "You don't believe that might makes right?," "And do you feel that a person, because he is a member of a labor union, deserves to get beat up once in a while?," and "You wouldn't permit sympathy or the feeling to 'let's give him another chance' to influence your decision in this matter?" These questions, of which defendants complain, were not improper; they were designed to elicit relevant information concerning the prospective jurors' state of mind. The question, "You know a clerk was beaten?," of which defendants complain, was not in the circumstances improper and certainly could not be prejudicial; the fact was indubitably established and it concerned the very subject of the assault charge which the jurors were being selected to try. Other questions complained of by defendants need not here be quoted; they were either proper or not prejudicial.

Complaint is made of the following matters in the prosecuting attorney's opening statement: The prosecuting attorney said, "Mr. Max J. Osslo was a member of the 1955 Grand Jury that returned the indictment." Defense counsel, moving to strike the statement, said, "Although everybody knows that, it is incompetent, irrelevant and immaterial." In view of the concession that "everybody knows that" it does not appear that the mention of the fact before the jury could have prejudiced defendants.

The prosecuting attorney stated at some length details concerning the secretary-treasurer of another Butchers' local being "worried about Osslo and worried about goons." Evidence concerning this matter was subsequently excluded. It does not appear that the reference to the matter could have prejudiced defendants. This and other references to "goons" by the prosecuting attorney were no more improper, in the light of the evidence developed by the prosecution, than would be a reference to "thieves" in a case in which defendants were on trial for larceny.

The trial judge instructed the jury before the taking of evidence began, as well as at the close of the case. In the

course of his preliminary instruction he commenced to read an instruction concerning assault with a deadly weapon which the prosecuting attorney had incorrectly included in his requested instructions. The judge immediately stopped reading and asked the prosecuting attorney if it was his contention that a deadly weapon was used. The attorney answered, "No. By means of force," but then said, "A prize fighter is a weapon?" This remark or query was improper, as was the request for an instruction concerning assault with a deadly weapon. But these incidents, not persisted in before the jury, do not appear to have been prejudicial.

Defendants complain that during the course of trial the prosecution brought into the courtroom and the sight of the jury a board on which were pictures referred to by counsel as "rogue's gallery" photographs of the defendants, made at the time of their arrest. The court declined to permit the use of these photographs in evidence. It is defendants' position that the prosecution, knowing that the photographs were improper, brought them into the courtroom in a manner such that the jury saw them and were prejudiced. The record does not disclose that the jury saw these photographs clearly or at length, but only that there was a dispute between prosecution and defense counsel as to whether they could readily have been seen by the jury. In the circumstances, even assuming that the jury did see the photographs, it is not shown that defendants were harmed. The jury were clearly and repeatedly instructed that they must determine the facts from the *evidence* produced in court, and that they must not consider any offer of evidence which was rejected by the court.

Objection was made and sustained to two questions of the prosecution as to whether Mr. Lundeberg supplied "strong arm men" for use in labor disputes. The use of the term "strong arm men," in the light of the evidence of circumstances under which the sailor defendants were employed by the Butchers, appears more realistic than prejudicial. In a pretrial statement of defendant Osslo in connection with his motion to quash the indictment it is admitted that "Osslo turned to Harry Lundeberg for help. This procedure in labor circles is not considered unusual. The mere presence of some formidable appearing men to accompany his business representatives he felt both would 'offset the pressure' and reduce the possibility of 'designs of injury.' "

A witness testified that a person whom she had seen

at the time of the assault "is the second gentleman," indicating the defendant Cacio. The prosecuting attorney said, "I object to the use of the word 'gentleman.' " In contrast to what occurred in *People* v. *Williams* (1942), 55 Cal.App. 2d 696, 700-702 [131 P.2d 851], the trial judge here immediately rebuked the prosecuting attorney and admonished the jury to disregard his remark. In the circumstances, the rebuke and admonishment appear sufficient to cure any harm which might have resulted from the prosecuting attorney's highly improper remark, and the Williams case is not authority to the contrary.

A police officer testified that he saw two of the sailor defendants in Osslo's office. The prosecuting attorney asked, "As a matter of fact, if you hadn't seen them in Osslo's office you would have run them out of town?" This question followed the officer's testimony that "I didn't like a couple of big, husky men walking around as bodyguards and gave the appearance of being toughs of the worst sort." Defense counsel objected that the prosecuting attorney's question was misconduct and the trial judge said, "That is uncalled for, Mr. O'Laughlin [the prosecuting attorney]. Don't repeat it. Proceed." It does not appear, in the light of the trial judge's rebuke, and of the facts that the jurors had ample opportunity to determine from personal observation whether the defendants were "big, husky men," and were admonished that they must decide the issues of fact on the evidence before them, not upon remarks of counsel, that the improper question was prejudicial.

The prosecuting attorney asked defendant Dimitratos, when Dimitratos was testifying, "As a matter of fact, any time Lundeberg gets in any type of dispute that he is out for a jurisdictional grab it is the old Communist slogan he uses——." Defense counsel interrupted with an objection and the trial judge sustained the objection and directed the jury to "disregard it." In the circumstances the interrupted, improper question does not appear to have been prejudicial.

Twice defense counsel objected to the prosecuting attorney's "yelling" at the defendant Cacio while Cacio was being cross-examined. On each occasion the trial judge replied that the prosecuting attorney could use any tone of voice which he wished to use. Although conceivably there could be circumstances under which the court's ruling might be questionable, it is not shown that the asserted "yelling" intimidated the witness or harmed defendants. Hence, we

cannot determine that the ruling was either erroneous or prejudicial.

■ In closing argument the prosecuting attorney referred to a case in which "a man died in the gas chamber" because of a battery, assertedly similar to that administered to the clerk Maurer by the sailor defendants, which resulted in the death of a woman. The judge promptly admonished the prosecuting attorney to "Confine yourself to this case." It does not appear that the defendants were harmed by the reference to the homicide case.

■ Defendants complain of the reference of the prosecuting attorney to Mr. Lundeberg and Mr. Jackson as "unindicted co-conspirators." The reference, although unfair to those gentlemen in the sense that they were not before the court and thus were not in a position to answer the charge, could not have been prejudicial to the defendants. It suggested only that entirely tenable view of the evidence which was taken by the prosecuting attorney and which we must presume was taken by the jury. Hence it did not constitute misconduct.

■ The prosecuting attorney in argument stated, "Meyer is the finger man." We have discovered no evidence to this effect. It appears that any prejudicial effect of the reference was corrected by the trial judge's prompt admonition that "The jury will remember the evidence. . . . [I]f the evidence isn't there the inference isn't there and they will disregard it."

It is to be noted that the prosecuting attorney at the beginning of his argument said, "what I am about to say is not evidence and if, in any way your version of the evidence is different than mine, you please take your own version of it." And the judge clearly and repeatedly instructed the jury that they were to decide the case on the basis of the *evidence* and further clearly instructed them that arguments of counsel were not evidence.[3]

■ Defendants object to statements in argument of the prosecuting attorney that Mr. Lundeberg was "a bed fellow

[3]The judge told the jury, among other things, that "it is up to you to determine what the facts are from the evidence introduced at the trial. . . . You are to be governed solely by the evidence introduced in this trial and the law as stated to you by me. . . . [Y]ou must determine the facts from the evidence produced here in court," and "argument of counsel on both sides is not evidence. . . . Whatever they say about the evidence, if you find that to be true, why you follow it. If whatever either side said about the evidence doesn't correspond with your views as you heard the evidence as it came in, why you disregard any comments they made and follow the evidence as you see it."

of Harry Bridges," that "It is two per cent his [Lunde-berg's] fight against Communism and ninety eight per cent his grab for jurisdictional power," and other similar state-ments. These statements were made in reply to defense coun-sel's argument that "The Sailors Union was the only thing that stood between complete Communist control of the Mari-time industry since 1935 and Harry Lundeberg personally was responsible for that on every occasion. He held that Sailors Union right and the Sailors Union had to fight in order to hold itself to keep from coming under the Bridges' control, as every other Maritime Union did." In the circum-stances the statements of the prosecution were not prejudicial.

 *The Conditions of Probation.* Defendants argue that the conditions of probation exceeded the trial judge's power by reason of the provision that defendants Osslo, McFaden, and Meyer shall not, during the 10-year probationary period, hold any union position or receive remuneration from any union. However, since it could be and presumably was found that these defendants are guilty of crimes growing out of union activities, it appears not improper that restrictions be placed upon such activities as a condition of probation.

 The granting of probation is entirely within the sound discretion of the trial court; a defendant has no right to probation; he does have the right, if he feels that the terms of probation are more harsh than the sentence imposed by law, to refuse probation and undergo such sentence. (*People* v. *Frank* (1949), 94 Cal.App.2d 740, 741-742 [211 P.2d 350].) In the Frank case the defendant, a pediatrician, was convicted of contributing to the delinquency of a minor by a lewd act committed on a child in a plaster cast. It was held proper that the terms of his probation include the requirement that defendant not practice medicine during the five years he was on probation. The court specifically rejected the argument, similar to the argument of defendants Osslo, McFaden, and Meyer here, that the condition of probation was unreasonable and beyond the power of the court.

Defendants are mistaken in their argument that the trial judge imposed on Osslo, McFaden, and Meyer county jail sentences and independently of such sentences granted periods of probation. Each probation order expressly suspends im-position of sentence and provides that probation is granted on the condition, among others, that defendant spend a desig-nated number of months in the county jail.

██ It does not appear that the trial judge had power to impose the following terms in his probation orders: "that this Court and Judge shall retain jurisdiction of this matter throughout the said period of probation and no other department of the Court or other Judge shall modify this order without notice to the Judge who tried the case." An individual judge (as distinguished from a court) is not empowered to retain jurisdiction of a cause. The cause is before the court, not the individual judge of that court, and the jurisdiction which the judge exercises is the jurisdiction of the court, not of the judge. ██ Rules of court which provide that post-trial proceedings in a cause shall be heard by the judge who tried the matter are entirely proper, but the individual judge cannot order that such proceedings must be heard by him.

*The Asserted Channeling of the Case into a Particular Department.* By stipulation this case was set for trial on July 9, 1956. All proceedings up to and including the making of the stipulation were had in Department 4 (Judge John A. Hewicker). The minutes of Department 4 show that on July 9 the cause was transferred to Department 2 (Presiding Judge Turrentine) for trial. Actually, the reporter's transcript shows, the transfer was for the purpose of selecting a jury only. The reporter's transcript further shows that, as already indicated, defense counsel refused to accede to the procedure of having a jury selected in Department 2 while the trial then pending in Department 4 was being completed and then having the cause transferred to Department 4 for completion of trial. Defense counsel moved that the cause be assigned to any available department for immediate trial. The court stated, "Motion granted, and the first court available will be Judge Hewicker, the regular criminal department. . . . [T]he case will be continued until two o'clock at which time the defendants, and all attorneys, and the jury is asked to return. If we are not ready then, why we will have to have continuances half a day at a time until we have a court available to try this case. I can't tell you exactly when that will be, but the case in Judge Hewicker's court may terminate at any moment . . . or it may take the rest of the week, but there is no alternative to that procedure . . ." Defense counsel objected to the continuance "on the ground that there are courts available and that there is going to be a civil trial to be started in one of the Superior Courts this morning, and a criminal case has precedence over a criminal [sic] case." The court said, "Objection overruled."

The cause was continued two or three times each day until July 16 when selection of a jury began in Department 4 before Judge Hewicker. On numerous occasions defense counsel objected to the continuances, pointed out that civil cases were commenced in other departments and that a jury had been selected in another department to try a criminal case which was originally set for trial later than defendants' case, and urged that the continuances were "part of the plan to channel a case into a particular court."

Judge Turrentine, in overruling one of defense counsel's objections to a continuance, explained at some length the reasons for the continuances. He said that "the case was originally pending in that Department [4] and was to go to trial there and it was only sent to this Department by Judge Hewicker for the purpose of getting a jury to try the case. . . . [I]n view of the objection to me trying—to me selecting a jury the only thing that could logically happen would be that it would go back to the Department where it originated and should be because Department 4 is the Presiding Criminal Department, and I am complying with the suggestion and request of Judge Hewicker."

Judge Turrentine further stated that the selection of a jury by a department other than the one in which the case was to be tried "is almost routine in this County. So we assumed . . . that on July 9th we would proceed in this Department to select the jury in order to give you a speedy trial and this was done at the request and suggestion of Judge Hewicker. It necessitated a very considerable rearrangement of business in this County to do it. We have four regular judges either away or assigned to duty on the District Court of Appeal, and, of course, we have the rather long trial in Department 4 going on. It is our general policy in criminal cases to give preference to the trial of those criminals who are incarcerated in jail so if they are deprived of their liberty unlawfully they may have their day in court and get out in preference to those who have the financial means to make bail . . . [Defendants were at liberty on bail.] If it were not for the fact that we had members of the San Diego County Bar who were willing to serve as Judges pro tem without compensation to themselves we would just simply be bogged down with nothing but a number of these short jury trials where the defendants are in jail awaiting trial."

The judge went on to explain the condition of the calendar in various departments, pointing out that a jury trial of a

person confined as mentally ill was being had in one department, that the juvenile calendar was "very congested," and that "today we have three criminal trials going on out of five regular judges, one regular and two pro tems . . ."

Defendants contend that the continuance of the case after the date set for trial, when civil cases were being tried in other departments, was in violation of section 681a of the Penal Code ("The welfare of the people of the state of California requires that all proceedings in criminal cases shall be heard and determined at the earliest possible time. It shall be the duty of all courts and judicial officers and of all district attorneys to expedite the hearing and determination of all such cases and proceedings to the greatest degree that is consistent with the ends of justice") and the provision of section 1050 of that code that "Criminal cases shall be given precedence over all civil matters and proceedings."

It does not appear that the policy of sections 681a and 1050 was disregarded. Judge Turrentine's explanation of the condition of the calendar shows that defendants were not being deprived of precedence over civil cases for any arbitrary reason and that the continuances to enable trial in Department 4 were not made for the purpose of improperly channeling the case into that department. Rather, it appears that the orderly administration of a crowded calendar required the continuances to enable trial of the case in a proper department. The precedence to which criminal cases are entitled is not of such an absolute and overriding character that the system of having separate departments for civil and criminal matters must be abandoned. And certainly it does not appear, as defendants suggest, that the "channeling" of this cause to Department 4, where it had been from its inception, was an improper channeling to a particular judge as an individual rather than as the judge of the presiding criminal department.

For the reasons above stated, the provisions by which the individual judge purported to retain jurisdiction of the cause are stricken from the orders granting probation. In all other respects such orders, and the judgments and order denying a new trial, are affirmed.

Shenk, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I dissent.

This case demonstrates, more than any other which has come under my observation, the abuse of our conspiracy stat-

ute. While the statute has a salutary objective, it may become a weapon in the hands of an overzealous prosecutor to make felonies out of mere misdemeanors and thus inflict great injustice upon people who are entirely innocent of any crime, but who may have had some connection or association with a person who has committed a misdemeanor. Under the holding of the majority in this case, it would be possible to obtain a felony conviction against all five occupants of an automobile for illegal parking, a misdemeanor, for which the driver of the car was entirely responsible. Take the case where a city ordinance prohibits parking within 10 feet of a fire plug—a car with five persons in it parks within the restricted zone. A police officer arrests all five occupants on the theory that the illegal parking was the result of an agreement between them—conspiracy to violate the parking ordinance. Under the majority holding here, the mere presence of the five in the automobile would give rise to a permissible inference of conspiracy to violate the parking ordinance and all five could be prosecuted and convicted of conspiracy which is a felony under section 182 of the Penal Code (*People* v. *Malotte,* 46 Cal.2d 59 [292 P.2d 517]) and all five could be sentenced to a state prison even in the face of their uncontradicted testimony that none of them except the driver had anything to do or say about the parking of the car. Such an outrageous travesty would be no greater than the prosecution, verdicts, judgments, sentences and affirmance of the judgments in this case. The foregoing statement is based upon the undeniable fact that there is not one word of testimony or any evidence in the record in this case of any agreement or understanding between any of the defendants that any crime would be committed by any defendant or that any conspiracy existed between them to violate any law, and there is no basis whatever for an inference that such a conspiracy existed.

The majority has quoted extensively from the testimony of some of the witnesses, but in all of this testimony there is not even a suggestion that there was an agreement or understanding between the defendants that any of them would commit a crime or that there was a plan, design or scheme to violate any law in any respect whatsoever, and the majority opinion does not refer to any evidence in the record which even remotely gives rise to an inference that a conspiracy existed between the defendants to violate a law.

True, a misdemeanor may have been committed by one or more of the defendants, but it requires something more than

legal reasoning or judicial interpretation to find evidence of a conspiracy between the defendants that any defendant should engage in the commission of an unlawful act.

The record shows that a jurisdictional dispute existed in San Diego County between the local butchers' union and the local retail clerks' union. The butchers' union was of the opinion that its members should handle certain merchandise such as frozen TV dinners rather than members of the clerks' union. Defendant Osslo was secretary-treasurer of the butchers' local, McFaden and Meyer were business agents for the same union. Four of the other five defendants were members of the Sailors Union of the Pacific and Cacio was a member of the Teamsters Union who had come from San Francisco to San Diego to accompany and protect the business agents of the butchers' local. The five defendants arrived in San Diego several days prior to October 22, 1955 and were in contact with Osslo, McFaden and Meyer; they attended a butchers' union meeting on October 21st. The record shows that these five defendants were paid weekly by the butchers.

The altercation out of which this case arose took place in Ferguson's Market in Chula Vista. The facts giving rise to the fight in which one Maurer, a retail clerk, was struck and injured are hotly disputed and present a very close question.

Defendants' major contentions are these:

(1) That there is no evidence that they conspired to commit assault;

(2) That the district attorney was guilty of prejudicial misconduct in numerous instances;

(3) That the court committed prejudicial error in the admission and exclusion of certain evidence;

(4) That the punishment imposed as to defendants Osslo, McFaden and Meyer is improper, excessive and unauthorized under the laws of the state and constitutes cruel and unusual punishment in violation of the Constitution.

The evidence, fairly stated, is as follows:

Early in September, 1955, there had been a strike of the butchers at the Food Basket Market in Pacific Beach which was authorized by Osslo, who was secretary-treasurer of the local union as well as the President of the Western Federation of Butchers, and the executive board. This strike arose over some 23 disputed items containing meat which were handled in the grocery department. After the strike in which about

20 persons were involved, the market brought an action for an injunction, and after the hearing, the items were taken off sale. On October 13, 1955, there was a retail clerks' strike at Ferguson's Market and there were pickets carrying signs. Outside the market, there were about 25 persons including business agents for the clerks and butchers, as well as some butchers employed elsewhere. Defendants Osslo, McFaden and Meyer claim that they were threatened at this time by members of the clerks' union and that as a result Harry Lundeberg of the Sailors Union of the Pacific was contacted and requested to send some men to accompany them during their rounds of checking contracts to see that they were not jumped from behind or injured by members of the clerks' union. Defendants Dimitratos and Hazel arrived in San Diego and reported to McFaden and on October 19th accompanied Jackson (butchers' union) and Meyer to Tang's market where they were, apparently, threatened by a member of the clerks' union who had a switch-blade knife and an outsider who had a gun. Osslo was contacted in Honolulu and advised Dimitratos to get some additional assistance which he did in the persons of Dempster, Cacio and Tucker.

On October 22nd, Osslo, McFaden and Meyer, accompanied by the five other defendants, visited several markets in San Diego. They arrived at Ferguson's Market at about 11 o'clock in the morning for the purpose of seeing one Linnville, partner and manager of the market. They were told to return at 1 o'clock. At 1 o'clock Dimitratos, Cacio, Hazel, Jackson, Meyer, Woodard, Dempster, Tucker and McFaden returned and went into the market. McFaden, Jackson and Meyer stayed near the entrance talking to Linnville; Hazel went to the back to talk to a young lady in the delicatessen department (the young lady testified that Hazel was with her at the time of the assault); Dimitratos went to the back and observed the meat department at the right; Tucker and Cacio, who had been to Tia Juana the night before and who had been drinking heavily, went in search of buttermilk and when they did not find it turned back and came across Maurer and Montgomery who were representatives of the Clerks from outside San Diego. Defendants claim that as Dempster walked past them, followed by Tucker and Cacio, Maurer put his foot out; that Dempster saw it and stepped over it, but that Tucker, thinking Maurer was trying to trip him, stepped on Maurer's foot; that Maurer struck at Tucker and missed and

hit Cacio; that Cacio struck back at which time Maurer grabbed Cacio by the testicles and lifted him off the ground; that Tucker and Cacio then struck Maurer until he dropped Cacio and Maurer went down; that Cacio and Tucker thought Maurer was reaching for a gun and Tucker kicked him until he was knocked out. Dempster came back and caught Cacio who was in great pain. Montgomery had disappeared at the first sign of trouble.

Dempster took Cacio whose trousers were torn and who was in pain to one of the two cars. He then asked McFaden for the keys and Dimitratos, Hazel, Cacio and Dempster then drove off looking for the Ace Motel where they were staying. They lost their way and were picked up by the police who found that Cacio and Tucker had been drinking and noted Cacio's condition and that of Tucker's hands. Maurer arrived at the police station that afternoon and identified them.

A bakery clerk at the market said that Tucker, Cacio and Dempster were the ones responsible for the beating. Maurer's testimony implicated Dimitratos in the fight; and showed that he thought he had hit Cacio in the stomach; that up until the time he was called a foul name and had been hit he did nothing at all to provoke a fight; that he and Montgomery had been trying to leave the store when they were "surrounded" by men. An organizer for the Clerks testified that Dempster was also in the fight; that Dimitratos and Hazel attempted to "get" Montgomery by chasing him.

The record contains testimony from both members of the clerks' and butchers' unions who were working in the market. A member of the Butchers testified that Maurer was "looking for trouble" on the day in question. The Clerks, on the other hand, testified that Maurer was just standing and minding his own business. It is obvious from the record that the testimony from both sides of the controversy was diametrically opposed.

The police officers testified that they had been alerted by radio from the Chula Vista police department; that when they stopped the car, Cacio, Dempster, Dimitratos and Tucker got out; that Cacio and Tucker said that "someone" had been reaching for a gun; that Tucker's hand was red and swollen; that Cacio's trouser leg was torn in two places at the thigh and that the men had been drinking. Dempster stated to the police that he had come from San Francisco on a vacation with his friends Tucker and Cacio; that he knew Dimitratos was in San Diego; that he did not know anything about a

fight; that he knew nothing about a dispute between the Butchers and Clerks; that he had not attended a union meeting and that he had nothing to do with the butchers' union. Tucker stated that he had come to San Diego with Cacio to do some drinking and visit Tia Juana; that he had not come with Dempster; that he had nothing to say about going to Ferguson's Market; that he had attended a union meeting; that he had heard about the jurisdictional dispute between the Butchers and Clerks. He denied any connection with the butchers' union; he denied that the butchers' union had hired him to come to San Diego. Dimitratos told the officers he had come to San Diego with Hazel for a vacation; that they were staying at the Grant Hotel; that he had spent time with his friend McFaden; that he had not, nor had his friends, been involved in the fight at Ferguson's Market. Cacio denied being employed by the butchers' union; or that he had any interest in, or knowledge of, the dispute between the Butchers and the Clerks. Hazel's answers to police questions were also confusing and inconsistent. Meyer denied being at Ferguson's Market on the day of the fight.

The People allege the following overt acts with respect to the conspiracy to commit assault count:

(1) That Osslo had a conversation with Harry Lundeberg, on or about October 13, 1955, in San Diego;

(2) That Dimitratos and Hazel met in San Diego on or about October 15, 1955;

(3) That McFaden, at Osslo's request, made reservations for three rooms at the U. S. Grant Hotel in San Diego on or about October 14, 1955;

(4) That McFaden, Dimitratos and Hazel met at the U. S. Grant Hotel on or about October 15, 1955;

(5) That Dimitratos and Hazel met at Butchers' Local 229, 227 E. Street, San Diego, on or about October 17, 1955;

(6) That Dimitratos, Hazel and Meyer, and other representatives of butchers' local met at Tang's Market, 4508 Cass Street, San Diego on or about October 18, 1955;

(7) That Dempster, Cacio and Tucker met in San Diego, on or about October 21, 1955;

(8) That Dempster, Cacio, Tucker, Dimitratos and Hazel met at the Ace Motel, San Diego, on or about October 21, 1955;

(9) That Dempster, Cacio, Tucker, Dimitratos and Hazel accompanied McFaden and Meyer to Ferguson's Market in Chula Vista on or about October 22, 1955;

(10) That Dempster, Cacio, Tucker, Dimitratos and Hazel were in a certain Ford sedan leased by butchers' local in San Diego on October 22nd;

(11) That Osslo and/or McFaden agreed to pay Dimitratos his expenses and a weekly salary on or about October 15, 1955;

(12) (13) (14) (15) That there was a similar agreement with Hazel, Tucker, Dempster and Cacio.

The People argue that from the above alleged overt acts, a jury could reasonably infer that a conspiracy to commit assault existed between the defendants; that the jury could reasonably determine that Osslo, with the knowledge and approval of McFaden and Meyer procured the services of the five sailor defendants for the purpose of intimidating the Clerks ''by their appearance *and that if this was not sufficient, of perpetrating an assault upon a clerk who should happen into their proximity.*''

There is evidence in the record which tends to prove all of the alleged overt acts. As I read the record, however, there is no evidence (*and the People point to none*) that the fight was planned, or premeditated, or that any of the proved overt acts lead to that conclusion. Assuming that Cacio provoked the altercation and that Maurer did not (although the evidence is extremely close on that point) telephone calls between the defendants, payment of expenses, salaries, and the making of hotel reservations, do not lead to the conclusion that the defendants were engaged in a conspiracy to commit an assault. The People argue, by quoting from the remarks made by the trial court, that because the five defendants were furnished bail, counsel, and their salaries were paid after the assault, that the assault had been planned between all defendants prior to its commission. In *People v. Williams,* 30 Cal.App.2d 234 [85 P.2d 974], relied on by the People, there was direct evidence that a conspiracy existed to commit assault. The same is also true of the case of *People v. Dail,* 22 Cal.2d 642 [140 P.2d 828], relied upon by the People. It is my conclusion that the alleged and proved overt acts charged against these defendants do not support the judgment convicting them of conspiracy to commit assault.

### MISCONDUCT OF DISTRICT ATTORNEY

It is the defendants' contention that the district attorney engaged in a course of prejudicial misconduct during the course of the *voir dire* examination of prospective jurors,

throughout the course of the trial, and during the arguments to the jury. Defendants cite numerous examples of misconduct, among which are the following:

On *voir dire* examination, prospective jurors were asked whether they felt that "any segment of our society should be immune from the law" or "should take the law unto themselves" and whether they felt that because a person was a "member of a labor union, [he] deserves to get beat up once in awhile"; whether (after the sustaining of an objection) the prospective juror felt that "might makes right"; whether because the Clerks and Butchers had settled their difficulties it would cause the prospective juror to adopt a "let's forget it" attitude; whether the prospective juror felt that "the community might have some interest in the matter"; whether the prospective juror had read "Victor Riesel's column 'Inside Labor'"; whether any of the people in the jury box had read the column; whether the prospective juror realized that every time the district attorney introduced a "bit of evidence in this case that in some way or other I am going to be prejudicing these defendants in your eyes"; that the juror realized "don't you, that we are not up here in a criminal department to elect Mr. San Diego"; that "if in the course of this trial and as you examine the facts surrounding the beating of the clerk in Chula Vista, if you become aroused, and as a public citizen as to what happened, will you try and remove that from your mind and just try the case on the evidence and the Court's instructions and use that to arrive at your conclusion"; whether the prospective juror had heard that Mr. Osslo was a member of the grand jury that indicted him. (An objection was sustained to the last question.) It should be here noted that defense counsel objected throughout the course of the questioning that the questions were argumentative; that the district attorney was attempting to prejudice the jury; that the questions were irrelevant and immaterial; that the questions were for the purpose of inflaming the minds of the jurors.

During the opening statement, the district attorney again referred to the fact that Osslo had been a member of the grand jury that indicted him and defense counsel's objection was overruled. The district attorney then stated that the evidence would show that "in the middle of October, 1955, another person was worried about Osslo and worried about goons." When defense counsel asked what the last word was, the district attorney replied: "Goons, Another man was worried

about Osslo and about goons. G-o-o-n-s (spelling). That man is Mr. Herb De Motte. He is a Secretary-Treasurer of a Butchers Local in Wilmington." Defense counsel's objection was overruled and the district attorney then made a long and involved statement concerning the internal affairs of the butchers' union and the difficulties between De Motte and Osslo; that De Motte was afraid of "goons. He was afraid to hold meetings." The district attorney's statement was obviously an attempt to show that Osslo was a man to be feared because he would set "goons" upon any person with whom he disagreed. Defense counsel's objections were overruled and the district attorney told the jury that De Motte would testify as to his fear of "goons." The defendants were constantly referred to as "goons."

Prior to the taking of testimony, the trial court inadvertently started to instruct the jury concerning assault with a deadly weapon. When defense counsel objected that no use of a weapon had been charged and that the evidence would show that no weapon had been employed, the district attorney asked his co-counsel in the hearing of the jury: "A prize fighter is a weapon?" Also assigned as misconduct is the fact that before the court had ruled on the matter, and during a conference in chambers concerning the admissibility thereof, a board containing photographs of all the defendants, some of which were taken on the day they were arrested, was so carried and placed in the courtroom that it was visible to the jury.

During the course of the trial, a witness was asked if he knew that Harry Lundeberg supplied "strong arm men in the labor movement." When an objection was sustained, the district attorney again asked if the witness knew whether or not on any prior occasion Lundeberg sent strong arm men into jurisdictional disputes or disputes with management. When a witness referred to Cacio as the "second gentleman there . . ." the district attorney said, "I object to the use of the word 'gentleman.'" The district attorney also managed to get in evidence the general strike in Oakland in 1948, or 1949, the Wall Street strike in 1948, the Western Union strike in 1952, the United Financial Employees strike in 1948, in an attempt to show that Harry Lundeberg furnished "strong-arm" men from the Sailors of the Pacific to aid in the strikes. To all of this evidence, defense counsel's objections were overruled. The district attorney in his questioning referred to sending two sailors out to "bird dog Anderson"

and to sending two sailors out "to finger Anderson." When Captain Roland, a police officer, testified that he "didn't like a couple of big, husky men walking around as bodyguards and [that they] gave the appearance of being toughs of the worst sort. I didn't like it, but it wasn't their physical appearance, other than they were big and husky," the district attorney asked him "As a matter of fact, if you hadn't seen them in Osslo's office you would have run them out of town?" In questioning the defendant Dimitratos, the district attorney asked: "As a matter of fact, any time Lundeberg gets in any type of dispute that he is out for a jurisdictional grab it is the old Communist slogan he uses. . . ."

During closing argument to the jury, the district attorney stated "Incidentally, let me say this: a man died in the gas chamber not too long ago for just this type of conduct. He beat a woman in the face and when she fell he kicked and killed her and he died for that." He also stated: "Incidentally, while mentioning him, let me say this: one or more of the jurors may say, 'Well, that Jackson was in this thing and he was at the scene and he did as much as some of the other people. Why isn't Jackson indicted? Why isn't Lundeberg indicted?' Those are unindicted coconspirators. That shouldn't concern you here. In other words. . . ." After objection, the court stated that the district attorney's "remarks weren't directly in conformity with the Indictment. The indictment does not name them as unindicted co-conspirators, but if he feels under the evidence they are co-conspirators he may so state." After other objections, the court again stated that if the district attorney felt that "some of his witnesses were co-conspirators he may so tell the jury, if he bases it on the evidence." The district attorney also told the jury "You hear about the great man, Harry Lundeberg, that is clearing the waterfront of Communists. Let me say this: Harry Lundeberg, Barney Mayes and Harry Bridges were all bed fellows at one time. . . ." After being told by the court to proceed with his argument, the district attorney said: "The water tenders, the firemen and what have you is an independent union and Lundeberg, in his grab for power, has used that old slogan to grab these unions, so that is malarky when they try to inject Communism in this case. It has been something Lundeberg used to control the docks. It is two percent his fight against Communism and ninety eight per cent his grab for jurisdictional power. That is what it amounts to. So don't let them get you off base on this

big man who, as I said, was a bed fellow of Harry Bridges back in the thirties. Bridges sponsored him to be head of the Maritime Federation of the Pacific.'' After the court told the district attorney to confine himself to the evidence, he said: ''So that fellow Lundeberg, don't get any misconception about him. That fellow Lundeberg, where were the Communists on Wall Street when they had five hundred men——

''The Court: Mr. O'Laughlin, I kept that out of evidence.

''Mr. O'Laughlin: Well, where were the Communists in the Western Union strike? When old Thompson got beat up because he happened to cross a picket line? None of that at all. Lundeberg—and the reason we were bringing it in, counsel says what has Wall Street to do with it and the general strike in Oakland, or what has the Western Union strike to do with it. It shows a pattern that Lundeberg supplies the noise and the muscle. He can swing a jurisdictional dispute; he can swing an election. You and I might be members of a union and be sore at the particular administration and we might want it out for one reason or another, but if the pack that is in brings down the muscle, brings down some of Lundeberg's boys, we are going to be silenced because we are going to be afraid of our lives, afraid to open our mouths, because if we do we might get the treatment Maurer and Thompson got.'' When this was objected to by defense counsel as unsupported by the evidence and as improper and inflammatory, the court merely told the district attorney to ''Proceed.''

While numerous additional instances of the same type of conduct could be cited, it appears that the above is sufficient to show that the district attorney was guilty of prejudicial misconduct insofar as all of these defendants are concerned. As we said in *People* v. *Dail,* 22 Cal.2d 642, 650 [140 P.2d 828], ''It is also true, however, that in a close case where the evidence is sharply conflicting, substantial and serious errors vital to defendant that may have resulted in a miscarriage of justice must be regarded as prejudicial and grounds for reversal. (*People* v. *Silver,* 16 Cal.2d 714, 723 [108 P.2d 4].)'' In the case at bar, the district attorney managed to interject much immaterial and irrelevant matter concerning strikes, the use of pickets, and assaults in other strikes which could not have had any other effect than to prejudice these defendants who were not claimed to have taken part therein. Further, the numerous references to the defend-

ants as "goons," "strongarm" men, "muscle" men, and the objections to the term "gentleman" as applied to one of the defendants were highly inflammatory and prejudicial, as were the district attorney's references to Lundeberg as a former Communist. From the district attorney's comments, arguments and questions, it appears that the entire labor movement was on trial and that anyone connected therewith was suspect as a participant in the trial of this particular case. Such conduct is reprehensible and should not be condoned. In *People* v. *Lyons,* 47 Cal.2d 311, 318 [303 P.2d 329], we said, quoting from *Viereck* v. *United States,* 318 U.S. 236, 248 [63 S.Ct. 561, 87 L.Ed. 734] : " 'The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' " Here, as in *People* v. *Teixeira,* 136 Cal.App.2d 136 [288 P.2d 535], ". . . it is hard to believe that this experienced prosecutor asked them [questions] in good faith and for any purpose other than to degrade defendants." In *People* v. *Vienne,* 142 Cal.App.2d 172 [297 P.2d 1027], it was held that the district attorney is bound to refrain from making inflammatory statements (see also *People* v. *Wilkes,* 44 Cal.2d 679 [284 P.2d 481]) ; in *People* v. *Henderson,* 144 Cal.App.2d 706 [301 P.2d 468] (where the same district attorney was involved), it was held prejudicial and reversible error for the prosecutor to state or imply the existence of facts concerning which no evidence had been introduced.

ADMISSION AND EXCLUSION OF EVIDENCE

It is first claimed by the defendants that the court erred in admitting the testimony of Captain Hodson. This testimony included the admission in evidence of part of the log book of the steamship Luckenbach concerning a fight in *1952* in which defendants Dimitratos and Dempster were involved.

Defendants contend, and their counsel argued at the time the evidence was admitted that the evidence was immaterial, irrelevant, too remote from the San Diego incident, and that it was prejudicial error for the prosecution in the first instance to put in evidence the bad character of the defendants. The trial court also permitted the People to put in evidence testimony that defendant Dimitratos had been stabbed in a fight on board ship in *1951*; and that Dempster and Hazel were in the same crew. In *People* v. *Teixeira,* 136 Cal.App. 2d 136, 148 [288 P.2d 535], *People* v. *Adams,* 76 Cal.App. 178 [244 P. 106], *People* v. *Nunley,* 142 Cal. 441 [76 P. 45], it was held that such evidence was inadmissible as an attack on the character of the defendant by the prosecution and constituted prejudicial error. In *People* v. *Lyons,* 47 Cal.2d 311, 317 [303 P.2d 329], where the prosecution alluded on the cross-examination of the defendant's wife to a prior conviction of defendant, we said: "It would be an impeachment of the legal learning of counsel for the People to intimate that he did not know the aforesaid questions to be *improper, wholly unjustifiable and peculiarly calculated to prejudice the appellant before the jury.*" (Emphasis added.) (See also *People* v. *Hardy,* 33 Cal.2d 52, 61 [198 P.2d 865] ; *People* v. *McKelvey,* 85 Cal. App. 769, 771 [260 P. 397].)

The above evidence was held admissible by the trial court on the theory that a conspiracy had been charged even though the People did not contend that the conspiracy had dated back to 1951 and 1952. Defense counsel's motion to strike was denied by the trial court. From the trial court's remarks, it is obvious that the evidence was held admissible on the theory that a *conspiracy presently existed* between all defendants.

The evidence was inadmissible on any theory and its prejudicial effect is at once apparent.

The admission of evidence concerning the Wall Street strike, the general strike in Oakland and the Western Union strike has heretofore been commented upon in the discussion concerning the prejudicial misconduct of the district attorney. The trial court's statement that "The reason I let this testimony in was to show other instances where the members of the Sailors Union were used and what transpired, to show the demeanor of the sailors used on the picket lines. In this conspiracy count you are entitled to know all the surrounding circumstances of the people that were employed in the incident down here, if one happened," and the court's later ad-

mission that there was an entirely different group of sailors in San Diego, clearly show the error that was committed. The case at bar involved an assault and a conspiracy to commit an assault and the fact that other sailors were used in picket lines in other areas remote in place and time is completely immaterial and irrelevant and was highly prejudicial to the defendants in the case at bar. (*People* v. *Lyons,* 47 Cal.2d 311 [303 P.2d 329]; *People* v. *Hardy,* 33 Cal.2d 52, 61-62 [198 P.2d 865]; *People* v. *Wynn,* 44 Cal.App.2d 723, 732-733 [112 P.2d 979]; *People* v. *Freitas,* 34 Cal.App.2d 684, 687 [94 P.2d 397]; *People* v. *Stafford,* 108 Cal.App. 26, 29-31 [290 P. 920].)

Defendants contend that the court erred in excluding testimony offered by them to show that threats had been made against some of them which necessitated the request to Lundeberg for bodyguards to accompany the Butchers' business agents on their rounds. Inasmuch as the evidence is in sharp conflict as to which side started the fight, this testimony should have been admitted. If threats had been shown to have been made against the business agents of the Butchers by members of the clerks' union, the evidence would be admissible as tending to prove the defense theory that the five defendants were summoned to San Diego to act as bodyguards only and to disprove the People's theory that a conspiracy to commit assault existed between all eight of the defendants.

PUNISHMENT OF OSSLO, McFADEN AND MEYER AS IMPROPER, EXCESSIVE AND UNLAWFUL

Osslo and McFaden were each fined $1,500 to be paid from their own funds; Meyer was fined $750 to be paid from his own funds.

Osslo and McFaden were ordered to serve six months in the county jail; Meyer was ordered to serve three months in the county jail.

These three defendants were placed on 10 years' probation, during which time they could hold no union office and receive no salary for any union services, or participate in any union negotiations. In addition, these defendants were required to fill out an annual affidavit that the fine payments were made from their own funds and that they held no union office, etc., and *"further, that this Court and Judge shall retain jurisdiction of this matter throughout the said period of probation and no other department of the Court or other Judge shall modify this order without notice to the Judge who tried the case. . . ."*

Defendants argue that the terms of their probation cut off their ability to earn a livelihood; that said terms violate the principle back of probation which "is defined as an act of grace and clemency, which may be granted by the court to a seemingly deserving defendant, whereby he may escape the extreme rigors of the penalty imposed by law for the offense of which he stands convicted." (*People* v. *Hainline,* 219 Cal. 532, 534 [28 P.2d 16]; *Lee* v. *Superior Court,* 89 Cal.App.2d 716, 717 [201 P.2d 882]) and that it violates the principle that the terms and conditions of probation must be reasonable under all the circumstances (*In re Trombley,* 31 Cal.2d 801, 811 [193 P.2d 734]).

While these three defendants were found guilty of both conspiracy to commit assault, and assault with force likely to produce great bodily harm, it is apparent from the record that they were not involved in the actual assault. Defendants claim, with merit, that it is impossible to determine whether they were convicted of a felony or a misdemeanor since they were charged with and found guilty of conspiracy to commit assault and charged with, and found guilty of, assault with force likely to produce great bodily injury.

Defendants' arguments in this respect have merit. It appears that the terms of probation are such as would deprive defendants of their means of livelihood and also violate the principles of probation. The purpose of probation is not to impose penalties (*In re Hays,* 120 Cal.App.2d 308, 310 [260 P.2d 1030]; *In re Martin,* 82 Cal.App.2d 16, 22 [185 P.2d 645]). It is my opinion that the trial court was guilty of an abuse of discretion with respect to the terms and conditions of probation imposed on defendants Osslo, McFaden and Meyer.

### ERRORS IN THE MAJORITY OPINION

THE EVIDENCE:

I have heretofore set forth a fair statement of the evidence as it relates to the case at bar. We are here concerned with evidence to support a judgment of conviction of *conspiracy* to commit assault. There is no doubt that an assault was committed by *some* of the defendants. Defendants Osslo, McFaden and Meyer were not involved in the actual assault and the People do not so argue. The majority opinion quotes at length from the testimony of one Jackson, a business agent for the Butchers. Nothing said by the witness, or quoted in the majority opinion, leads to the conclusion that these defendants were engaged in a conspiracy to commit assault. The

majority makes much of the statements of the witness that the police force was not called for protection rather than members of the sailors' union, that older, unemployed members of the butchers' union of San Diego were not called upon to act as observers and that members of other San Diego labor unions were not called upon. The witness' testimony regarding his belief that members of the Butchers had reason to fear violence from the Clerks is quoted extensively in an endeavor by the majority to show that no such fear could reasonably have existed. In the first instance there is no law that I am aware of which would require these defendants to ask police protection or to hire any particular segment of society to act as their observers. I also know of no law prohibiting the hiring of a bodyguard for protection. It also appears to me highly unlikely that any police force would have sufficient men available to accompany members of labor unions on their rounds in order to *prevent* trouble which at that time was only a possibility. Insofar as the fear of trouble was concerned and any threats, by conduct, or otherwise, made by members of the Clerks to members of the Butchers were concerned it appears to me that fear is subjective and that these men, who were there at the time, were far more able to recognize it than the members of the majority of this court who only know what appears in the record as we see it today.

Because defendant Osslo said he was "top man" on the west coast and "that was it" and because he said the Butchers would "show" the Clerks, the majority infers that Osslo "set up a situation which inferentially was designed to, and which clearly did, increase the likelihood of violence in the jurisdictional dispute. On a view of the evidence favorable to the prosecution, which the law at this stage of the proceeding requires of us, it is fairly inferrible that Osslo, McFaden, and Meyer at least tacitly understood, anticipated that the remaining five defendants would not merely be present to act as 'observers' and protect the Butchers from violence, but would and should initiate the violence, which they subsequently did initiate, to 'show' the Clerks that Osslo indeed 'was boss of the West Coast and he would fight for jurisdiction' and 'that was it.' " *No such inferences can be fairly drawn from the record.* It should be borne in mind that the conspiracy charged here was to commit assault—*not* a conspiracy to make Osslo "boss" of the west coast! There is absolutely nothing in the record from which an inference may be drawn that Osslo intended the five defendants to "initiate" violence and

in the state of this record with its numerous instances of prejudicial misconduct and the close question of fact presented concerning just which labor union instigated the altercation, this court should not concern itself with drawing such an inference. Because *other* members of the sailors' union had participated in other labor union disputes in other parts of the country in 1948, 1949 and 1952, and had, *according to the majority,* been guilty of assault and battery in connection therewith, we are told that we may infer that Osslo, McFaden and Meyer knew that these defendants would *initiate* violence. So far as this record is concerned we do not know whether or not the members of the sailors' union engaged in those other strikes were the guilty ones in the crime of assault and battery. For all we know, the other parties involved may have been the guilty ones and the sailors' members completely innocent. Even if the members of the sailors' union involved in those other strikes were the guilty ones, should every member of a labor union to which he must belong if he is to earn his livelihood be held guilty of the same crime? The question answers itself and shows the fallacy in the reasoning of the majority. That reasoning carries the philosophy of ''guilt by association'' to its ultimate extreme.

ADMISSION AND REJECTION OF EVIDENCE:

The majority feels that the admission of evidence concerning other and remote labor disputes in which other members of the sailors' union were involved was not prejudicial error when considered in the ''light of other circumstances, including the prior activities of Osslo, McFaden and Meyer'' to show that these men ''contemplated that the employment of the sailor defendants probably would result in acts of violence by'' the other five defendants. First we are told to rely on the asserted violent tendencies of other members of the sailors' union to show that Osslo, McFaden and Meyer are guilty as charged and, secondly, that ''the prior [unexplained] activities'' of the three men made such evidence admissible because it showed their knowledge that violence would result. There is absolutely nothing in the record to show any connection between the other strikes in which other members of the sailors' union participated and any of these defendants except that some of them belonged to the sailors' union.

The majority finds that the jury could not have been misled because of the admission of evidence of fights, unconnected

with labor activities, which occurred in 1951 and 1952, and which occurred on board ships on which Dimitratos and Dempster were sailors. It is said that "in light of the circumstances surrounding their importation and employment, it does not appear that the jury could have been misled by evidence that they had been involved in other altercations." The only reason for the admission of such evidence would be to show the allegedly bad character of these two defendants and was wholly inadmissible as I have heretofore pointed out and such evidence has, up until this case, been held to constitute an unwarranted attack on the character of a defendant and to constitute prejudicial error. The question is not one of misleading the jury but goes to the question of due process in that every person accused of a crime is entitled to a fair trial on the merits of his particular case.

Concerning the admission of evidence of telephone calls between the defendants and other members of their organizations of which the defendants complain, the majority says "This evidence was properly received to show defendants' association; *that that association was criminal is shown by the other evidence, viewed as a whole.*" This statement assumes the answer to the main question involved—whether defendants *conspired* to commit the assault and battery which occurred. Mere association and telephone calls, the subject matter of which is completely unknown, have never, until now been sufficient to show that a conspiracy to commit a crime existed. Under the holding here, no association, no telephone call, can be innocent and immune from a later charge of conspiracy if one of the parties should later be accused of a crime of any type.

With respect to the admission of evidence of the arrest of two members of the clerks' union *after* the assault and battery involved here occurred, and of which defendants complain, the majority says that "This testimony tends to show that defendant Osslo, after the assault, attempted to harass the Clerks by unsubstantiated accusations and to distract emphasis from the charges against him by countercharges; it was thus admissible as tending to show that Osslo was a conspirator carrying on an effort to make good his declaration that he 'was boss of the West Coast and he would fight for jurisdiction,' and not, as he argues, the innocent employer of persons who were to act as 'observers' or at the most to show the Clerks that the Butchers were protected, without the exercise of force." The conspiracy charged here was that

of assault and battery, *not* the promotion of Osslo as "boss" of the west coast. The assault and battery had occurred before the arrest of the clerks and hence the conspiracy, if any, had been terminated. To be admissible, the act or declaration must have been made during the pendency and *prior to the termination of the enterprise and in furtherance of the common design (People* v. *Brown,* 59 Cal. 345; *Estate of Strachan,* 166 Cal. 162 [135 P.. 296]; *Budd* v. *Morgan,* 187 Cal. 741 [203 P. 754]; *People* v. *Ferlin,* 203 Cal. 587 [265 P. 230]; *People* v. *Smith,* 151 Cal. 619 [91 P. 511]; *People* v. *Kynette,* 15 Cal.2d 731 [104 P.2d 794]; *People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17]).

The majority holds that the exclusion of evidence concerning McFaden's report to Jackson and Osslo that he had been frightened by the Clerks could not, in the "light of the record" have prejudiced defendants. This evidence was patently admissible under the defendants' theory and should have been admitted. It is clearly seen that evidence damning to them is held properly admitted while evidence in their favor is held properly excluded. A fair trial encompasses all the relevant and material admissible evidence whether favorable, or unfavorable, to either side. A fair trial does not mean a trial where the prosecution uses every means, whether fair, or foul, to gain a conviction and no court should condone such a practice. As we said in *People* v. *Lyons,* 47 Cal.2d 311, 317 [303 P.2d 329], it would be an impeachment of the legal learning of counsel for the People to intimate that he did not know that what he was doing was improper, wholly unjustifiable and peculiarly calculated to prejudice the appellant before the jury. Counsel for the People knew, or should have known, that his conduct and a great deal of the evidence produced by him was wholly irrelevant and that it was "peculiarly calculated to prejudice" the defendants in the eyes of the jury. He should also have known that evidence relevant to defendants' side of the case was admissible and a part of the entire background of the American system of jurisprudence —a fair trial.

MISCONDUCT OF THE DISTRICT ATTORNEY:

I have heretofore set forth in detail some of the instances in which the district attorney was guilty of prejudicial misconduct and the majority has cited some additional examples all of which were calculated to and did inflame the minds of the jurors. The majority, however, finds that "the evi-

dence so overwhelmingly supports the implied findings that it does not appear reasonable to believe that the misconduct was a contributing factor'' in arriving at the verdicts. As I have pointed out at length the evidence is far from overwhelming—it is nonexistent so far as a conspiracy is involved since the overt acts, in and of themselves, while proved, do not lead to the inevitable conclusion that defendants conspired to commit assault and battery. The overt acts charged consisted of a number of conversations and meetings between the defendants, a labor meeting at which defendants were present, hotel reservations made for some of the defendants; defendants' presence in cars leased by the butchers' local of San Diego; salaries agreed to be paid to the five defendants by Osslo or McFaden. There was no proof, either direct or circumstantial, of what the conversations were at either the meetings or at the labor meeting; there was no proof either direct or circumstantial that at any of the times charged, defendants conspired to commit assault and battery. The majority, however, infers that all of these meetings were used for an evil and unlawful purpose and concludes that the evidence against all the defendants is so ''overwhelming'' that no misconduct could have prejudiced the defendants in the eyes of the jury.

It can hardly be doubted that the interjection of Communism in the case was prejudicial to the defendants as was the use of the words ''goon,'' ''finger man,'' ''strong-arm men,'' and ''toughs.'' All of these things tended to attack the character of the defendants so as to prejudice them in the minds of the jurors and from the state of the record were obviously calculated to do just that by the prosecutor.

An admonition to the jury to decide the case on the evidence produced is insufficient to cure the errors and misconduct which occurred in this case. A reading of the record shows that from the *voir dire* examination of prospective jurors, throughout the trial, and until its close, the prosecution was guilty of a deliberate attempt to harass, embarrass, and prejudice these defendants. The majority finds nothing wrong with the trial judge permitting counsel for the People to ''yell'' at one of the defendants while on the stand. It is said that the record does not show that the ''yelling'' intimidated the witness. The district attorney is a representative of the People and as such is not ''at liberty to strike foul'' blows. Here, as in *People* v. *Teixeira,* 136 Cal.App.2d 136 [288 P.2d 535], ''. . . it is hard to believe that this expe-

rienced prosecutor" yelled at a witness "in good faith and for any purpose other than to degrade" him.

CONDITIONS OF PROBATION:

I have heretofore discussed these conditions and my reasons for feeling that they were excessive and in violation of the principle of probation. The majority cites *People* v. *Frank,* 94 Cal.App.2d 740, 741-742 [211 P.2d 350], as authority for its holding that the punishment imposed was perfectly proper. In the Frank case the defendant was himself guilty of committing a crime. In the case at bar, defendants Osslo, McFaden and Meyer were not guilty of the actual assault and it is only by means of the improper use of the conspiracy statute that they are in any way involved. As I have pointed out the record shows a total lack of evidence that these defendants conspired with the others to commit the crime with which they were charged and a majority of this court, in affirming the judgments of conviction and the terms of probation, has deprived these three defendants of their means of earning a livelihood since they may not even work as the most menial of laborers in their own union and cannot receive remuneration "from *any* union." The terms of probation are wholly out of line with the cases holding that probation is an act of grace and clemency for the purpose of permitting rehabilitation of a defendant who is "seemingly deserving" and for the purpose of permitting him to "escape the extreme rigors of the penalty imposed by law for the offense of which he stands convicted" (*People* v. *Hainline,* 219 Cal. 532, 534 [28 P.2d 16] ; *Lee* v. *Superior Court,* 89 Cal. App.2d 716, 717 [201 P.2d 882] ).

SUMMATION

In my opinion:

1. The judgment should be reversed with directions to dismiss the charge of conspiracy to commit assault as to all defendants because of the total lack of evidence in the record to support the charge.

2. The record shows that only the defendants, *Cacio, Tucker* and possibly *Dempster* and *Dimitratos,* could have engaged in the assault. There is *no* evidence to show that it was other than a spontaneous assault and, in view of the sharp conflict in the evidence as to the person responsible for starting the altercation and the prejudicial misconduct of the district attorney, as well as the highly prejudicial character of the evidence erroneously admitted (as heretofore discussed), the

judgments should be reversed as to them in order that they may have a fair trial on the merits. We held in *People* v. *Lyons*, 47 Cal.2d 311, 319 [303 P.2d 329], that "It is axiomatic that when an accused is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law (*Powell* v. *Alabama* [1932], 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527])."

3. Since there is no evidence which tends to connect defendants Osslo, McFaden, Meyer and Hazel with the actual assault, the trial court should be directed to dismiss as to these defendants the charge of assault by means of force likely to produce great bodily injury.

Gibson, C. J., and Traynor, J., concurred.

Appellants' petition for a rehearing was denied April 23, 1958. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.